Gregory Markow (State Bar No. 216748)
gmarkow@cgs3.com
Crosbie Gliner Schiffman Southard & Swanson LLP (CGS₃)
12750 High Bluff Dr., Suite 250
San Diego, California 92130
Telephone: (858) 367-7676

David Berten (IL Bar # 6200898) (to be admitted *Pro Hac Vice*)
dberten@giplg.com
Alison Aubry Richards (IL Bar # 6285669) (to be admitted *Pro Hac Vice*)
arichards@giplg.com
Global IP Law Group, LLC
55 West Monroe Street, Suite 3400
Chicago, IL 60603
Telephone: (312) 241-1500

*Attorneys for Plaintiff Rich Media Club LLC*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICH MEDIA CLUB LLC,<br><br>      Plaintiff,<br><br>v.<br><br>MEDIANEWS GROUP, INC.,<br><br>      Defendant. | Case No.   **'25CV2141 BEN DEB**<br><br>**COMPLAINT FOR PATENT INFRINGEMENT AND JURY TRIAL DEMANDED** |

COMPLAINT

This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, against Defendant MediaNews Group, Inc. ("MediaNews") that relates to five U.S. patents owned by Rich Media Club, LLC ("RMC"): 9,824,074 ("the '074 Patent") 11,004,090 ("the '090 Patent"); 11,468,453 ("the '453 Patent");   11,741,482 ("the '482 Patent"); and 12,125,051("the '051 Patent") (collectively, the "Patents-in-Suit").

## **The Parties**

1.     Plaintiff Rich Media Club LLC ("RMC") is a company organized under the laws of the State of Florida with a principal place of business in Salt Lake City, Utah.

2.     Defendant MediaNews Group, Inc. ("MediaNews") is a corporation duly organized and existing under the laws of Delaware. MediaNews is registered to do business in California may be served through its registered agent for service of process, C T Corporation System, 330 North Brand Blvd, Suite 700, Glendale, CA 91203.

3.     MediaNews operates many business, including as a publisher of a large number of internet websites, many of which are linked to the 77 daily and 150 weekly publications MediaNews owns and operates.   MediaNews's website are available throughout the United States, including in the State of California generally and this judicial district in particular.

## **Jurisdiction and Venue**

4.     This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, et seq., and more particularly 35 U.S.C. § 271.

1

COMPLAINT

5.      This Court has jurisdiction over the subject matter of the patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over MediaNews pursuant to due process and/or the California Long Arm Statute because, inter alia, (i) MediaNews has done and continues to do business in California; (ii) MediaNews has committed and continues to commit acts of patent infringement in the State of California, including by operating websites accessible in California that use technologies that infringe the Patents-in-Suit; and (iii) MediaNews Corporation is registered to do business in California.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). Venue is further proper because MediaNews has committed and continues to commit acts of patent infringement in this district, and MediaNews has regular and established places of business in this district, including at least at The San Diego Union-Tribune, 600 B Street, Suite 1201, San Diego, CA 92101.

## Background Facts

## The Patents-in-Suit

8.      U.S. Patent No. 9,824,074, entitled "Content Rendering and Control System for a Pre-Defined Area of a Content Page," was duly issued on November 21, 2017 and is assigned to Plaintiff.

9.      U.S. Patent No. 11,004,090 entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on May 11, 2021 and is assigned to Plaintiff.

COMPLAINT

10.    U.S. Patent No. 11,468,453, entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on October 11, 2022 and is assigned to Plaintiff.

11.    U.S. Patent No. 11,741,482, entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on August 29, 2023 and is assigned to Plaintiff.

12.    U.S. Patent No. 12,125,051, entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on October 22, 2024 and is assigned to Plaintiff.

**Online Advertising and RMC's Technology**

13.    Online advertising, including placing ads on web pages, is one of the largest advertising markets in the world.  It is also one of the most technologically complex because of the various ways that ads can be placed on web pages, monitored, and replaced. The technologies used for internet advertisements are different than those used in non-internet based mediums such as print and broadcast advertising.

14.    The online advertising system also faces many challenges that are not common in certain other media.  For example, ads placed in printed media are readily verifiable to advertisers.  The ads either appear in print or were not printed for some reason. Broadcast television ads are similar.  They can be verified as having run, in full, during the purchased ad time by reviewing recordings of broadcasts.  There is no situation where the printed or televised ads were not "viewable" when a reader turned to a page of a publication

COMPLAINT

or watched an ad-supported broadcast.

15.     Online advertising is different.  For any given content, such as an online magazine article, the way the user reads the article varies significantly for different users. Screen sizes can vary from small smartphone screens to large multi-screen monitors. The size of the browser widow on each of these various sized screens is itself varied.  An ad placed that would have run on page 2 of a print article may fall on many different "pages" of an article that is scrolled through on many different users' differently-sized web browsers and screens.

16.     The internet advertising industry and this complaint sometimes refer to the user's open web page dimensions as the "viewport."  When web page content is larger than the size of the viewport, the content can be understood to enter and leave the viewport as a user scrolls through the webpage.  If part of the content on a web page includes ad spaces, these ad spaces also often enter and leave the view port.

17.     If the user never scrolls to particular parts of the web page content, however, much of the content of the page, including ad spaces, may never have actually become viewable to the online reader. The reader may never scroll to a part of the article where the ad space (and ad) would have appeared.

18.     Verifying whether an online ad entered a part of a web browser window that was viewable to each of many varied web browser/screen combinations presented a technological challenge that had to be solved for online advertising to work.  No advertiser wants to pay for ads that are effectively invisible, and publishers want to be able to

COMPLAINT

demonstrate that viewers can see the ads their advertisers are paying for.

19.    RMC solved these and other technical issues with innovative, patented technology.  By understanding the relationship between the size of content and the size of ads placed alongside the content, RMC's technology can, among other things: (1) confirm that an ad is actually placed with the content regardless of whether it becomes viewable (and for how long); (2) confirm that an ad (or a percentage of an ad in a given ad space) actually was displayed in the viewport (and for how long); (4) allow for an ad space to be refreshed with a different ad based on various criteria, such as how long or how much (or both) of the ad space had been within the viewport (so-called "ad refresh"); and (5) assist in loading ads just before a user is expected scroll to the content that contains the ad space (what is sometimes referred to as "lazy loading"); .

20.    As of 2025, RMC has received more than ten issued United States patents for inventions related to ad viewability, monitoring, confirmation, lazy loading, refreshed ads and other technological solutions to the placement of ads on web pages.

21.    This Complaint will describe the '482 Patent as one example of the kind of technological disclosures that the Patents-in-Suit teach and disclose.

22.    The claimed inventions make specific technological improvements to the functionality and usefulness of electronic networks used for advertising. For example, The '482 Patent explains:

> The present invention improves over prior advertising systems and methods
> in many ways. The present invention does not embed advertising HTML,
> files within a web page, providing considerable economies to advertisers in

5

saved labor, time and cost in terms of both inserting advertisements into web page files, and later changing any of those advertisements. The present invention functions totally transparently to a network user and which neither inconveniences nor burdens the user. The present invention does not require a network user to download or install on the user's computer a separate application program specifically to receive advertising or perform any affirmative act other than normal browsing to receive such advertising.

23.    The details of the system and methods are in the claims, which must be read in light of the specification, including its figures. The 83 figures in the patent make clear that a non-abstract system was invented. For example, Figure 1 is a diagrammatical overview of the communication flow of the present invention. Figure 2 is a diagrammatical representation of system components and their interrelationship. Figure 3 is a diagrammatical overview of the relationship among system servers and website viewers. Figure 51 is a is a diagrammatical overview of the interplay and overlap of a viewer's screen display area, browser application, browser window and ad content display page.

COMPLAINT



FIGURE 1



FIGURE 2

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23



**FIG. 51**

24    24.    The '482 Patent describes the invention in the context of Fig. 51:

25

26    As can be seen, the ad content display page is larger than the browser
27    window, so not all of the ad content display page area is within the browser
      window dimensions and scrolling position shown on the viewer's display

28

COMPLAINT

screen. In this embodiment the activation of billboard modules can be controlled so that only the billboard module that is designated to activate when a pre-defined area within the ad content display page area is within, or within a pre-defined distance outside of, the viewer's browser window dimensions and scrolling position is activated, and so that billboard module activation occurs only when such pre-defined ad content display page triggering area is within, or within a pre-defined distance outside of, the viewer's browser window dimensions and scrolling position.

25.    With reference to Figure 51, the area marked "41" is visible to the viewer or what was earlier described as the viewport.

26.    Electronic advertising that was never actually displayed or seen by consumers was an unresolved technical problem as of the time of the patented invention.

27.    The ability to place an ad in response to a determination that a particular ad space had been within the viewport of a user for a predetermined amount of time was an unresolved technical problem as of the time of the patented invention.

28.    The ability to place an ad in response to a determination that a particular ad space was outside of but nearing the viewport of a user was an unresolved technical problem as of the time of the patented invention.

29.    The '482 patent's claims address the problems with Internet advertising at the time. The RMC claims disclose an inventive solution for particular Internet-centric problems.

30.    The claims address these technical challenges. These challenges are particular to advertising on the internet and other electronic networks.  The claims do not resolve these problems by reciting an abstract idea or through routine, well-understood, or

9

conventional steps or components. At the time of the invention, the individual elements in the claim, and the claimed combination, were not well-understood, routine, or conventional activity.

31.    The claims do not recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.  Confirming that it is rooted in technology, and that it does not recite only conventional computer technology, the patent specification discloses over ten pages of sample computer code.

32.    The claims do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). The claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result different from the conventional and a result that overrides the routine and conventional sequence of events ordinarily triggered. The invention stops the computer network from operating in its normal, expected manner by reciting an invention that is different from the routine or conventional use of the Internet.

33.    The claims of the '482 patent do not claim any basic tool of scientific and technological work or hinder the use of any idea in all scientific fields.

34.    Multiple patents and patent applications constituting or related to the Patents-in-Suit have overcome rejections under § 101 in multiple fora. For example, the Patent Trial and Appeal Board reversed a rejection under § 101 of Application No. 11/803,779,

COMPLAINT

now U.S. Patent No. 10,380,602. That decision is *Ex Parte Krassner*, dated December 18, 2018, and is attached as Exhibit A and incorporated by reference. The PTAB found those claims, similarly directed to presenting electronic advertisements on webpages, to be patentable subject matter.

35.    In its decision, the PTAB relied on *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014):

> Accordingly, as in *DDR Holdings*, the claims recite "a solution to this network-centric challenge," e.g., the efficient, timely, and cost effective application of advertisements to webpages, for which there was no precomputer or pre-Internet analog.

36.    During prosecution of another patent related to the '482 patent, U.S. Application No. 11/643,245, now Patent No. 10,380,597, the examiner relied on the *Ex Parte Krassner* decision in the Notice of Allowance, explaining that "per the reasoning explained in the Patent Board Decision issued on December 18, 2018, the previous 101 rejection, 103 rejection, and examiner arguments have been withdrawn and the claims are allowable." A copy of the office action is attached as Exhibit B and incorporated by reference.

37.    With regard to one of the Patents-in-Suit, the '090 Patent, the Examiner made an initial 101 rejection, which was later discussed in an Interview. The Notice of Allowance states under the headings "Allowable Subject Matter" that the pending claims "are allowed."

38.    With regard to another of the Patents-in-Suit, the '453 Patent, the Examiner

COMPLAINT

withdrew an initial 101 rejection in the Notice of Allowance, finding: "The Amendment in combination with other limitations form an ordered combination and integrated practical application. 101 withdrawn."

39.    With regard to another of the Patents-in-Suit, the '482 Patent, the Examiner withdrew an initial 101 rejection in the Notice of Allowance, finding: "Applicant argument resolved the 101 issues."

40.    With regard to another of the Patents-in-Suit, the '051 Patent, the Examiner withdrew an initial 101 rejection in the Notice of Allowance, finding:

> Examiner is removing the rejection under 35 USC 101. The currently amended independent claims include significantly more than any alleged abstract idea. The currently amended independent claims constitute an "ordered combination" that provide a specific, discrete implementation that provides significantly more than the abstract idea itself. To illustrate, the currently amended independent claims recite an ordered combination of features that are comparable *to BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC,*2016 WL 3514158, (Fed. Cir. June 27, 2016). In *BASCOM*, the Federal Circuit held that "an inventive concept can be found in the ordered combination of claim limitations that transform the abstract idea into a particular, practical application of that abstract idea." *Id.* In particular, the currently amended independent claims are directed towards a specific, discrete implementation of browser advertising.

A copy of the Office Action is attached as Exhibit C and incorporated by reference.

41.    Technological solutions claimed in the Patents-in-Suit were not routine, well-understood, or conventional at the time of invention. In 2009, for example, David Cohen, now the Chief Executive Officer of the Interactive Advertising Bureau, described RMC's technology: "It would appear that (among other things) RealVu has developed a technology that allows them to identify when an online ad is 'within the viewable area' of a user's

COMPLAINT

screen, and for what duration." According to Mr. Cohen writing contemporaneously in 2009, the technology was "a giant step forward for the industry" that "will set a new bar for accountability – one that will influence all communications channels" and "could change everything." A copy of Mr. Cohen's blog post is attached as Exhibit D and incorporated by reference.

42.    In addition to findings in the PTAB, The Patent Office, and the reaction of industry insiders, the Court in *Rich Media Club, LLC v. Duration Media LLC*, 681 F.Supp.3d 1032 (D. Az. 2023) (the "Arizona '329 Action") determined that the claims of another patent related to the Patents-in-Suit, United States Patent No. 11,443,329 ("the '329 Patent"), was subject matter eligible. A copy of the court's decision denying a motion to dismiss asserting the '329 Patent was not subject matter eligible is attached as Exhibit E and incorporated by reference.

43.    The Arizona Court expressly found:

"the '329 Patent is directed to a non-abstract concept: a technological solution to a technological problem. There is no direct pre-computer analog to the problem of lack of accountability for consumer viewability of Internet advertisements caused by the consumer's ability to access the Internet using variations of computer devices with differently sized browser windows. The code generation claim limitation narrows with sufficient specificity the allegedly abstract concept of advertising in a predefined area upon determination of a predefined condition and does so in response to a problem that is unique to the Internet. Therefore, the claimed process of the '329 Patent is deeply rooted in technology and thus directed to a patent-eligible concept.

*Rich Media Club*, 681 F.Supp.3d at 1041.

44.    The Arizona Court also found:

COMPLAINT

The '329 Patent contains an inventive concept: implementing a sizing technology in a process for using generic computer equipment in a novel way. As the Examiner stated regarding the '329 Patent Application,3 the claims of the '329 Patent "in combination with other limitations form an ordered combination and integrated practical application" and thus overcome any objections to the validity of the '329 Patent under 35 U.S.C. § 101. (Am. Compl. Ex. D at 2.) The claims of the '329 Patent provide with sufficient specificity the process and method for Internet advertisement placement based on utilization of an inventive technology for determining the size of a user's browser window.

*Rich Media Club*, 681 F.Supp.3d at 1042.

45.    The Arizona Court's analysis was correct, and the analysis and conclusions apply with equal force to each of the Patents-in-Suit.

46.    Each of the Patents-in-Suit is patent subject matter eligible.

47.    None of the claims of the Patents-in-Suit are directed to an abstract idea (*Alice* Step One).

48.    Each of the claims of the Patents-in-Suit include an inventive step (*Alice* Step Two).

**A Previous Effort to Challenge the Validity of a Patent-in-Suit Failed**

49.    On May 17, 2024, Duration Media LLC filed a Petition for Inter Partes Review of the '482 Patent, which was identified as IPR2024-00937 ("the '937 Petition") by the PTAB.

50.    On October 17, 20224, the PTAB issued a institution decision denying institution of the '937 Petition. A copy of the decision denying institution is attached as Exhibit F and incorporated by reference.

COMPLAINT

51.    The PTAB's decision denying institution concluded that the references Duration submitted did not disclose at least this novel aspect of the '482 Patent: "in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window, causing a communication to be sent from the remote computing device to one or more dispatcher servers, wherein the one or more dispatcher servers are configured to:(i) receive the communication, and (ii) cause advertisement content to be served to the remote computing device." Ex. F at 13.

### Select Objective Indicia of Non-Obviousness

52.    RMC has collected and presented extensive evidence of the presence of objective indicia of non-obviousness of the inventions described and claimed in the Patents-in-Suit.   Should MediaNews challenge any of the Patent-in-Suit based on obviousness under section 103 of the Patent Law, any such challenge must consider this extensive objective indicia of non-obviousness under the "totality of the evidence" test set forth in *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202 (Fed. Cir. 2023). For brevity, the exhibits supporting the objective indicia of non-obviousness are not filed with this complaint but will be produced with RMC's initial disclosures. In the meantime, the relevant exhibits are publicly available from the RMC filings in at least IPR2023-00953.

53.    As a matter of historical fact, there is no evidence of an actual demonstration of an ad viewability test, or the placement of refreshed ad in response to the viewability

COMPLAINT

determination, prior to the invention by Rich Media Club.   As documented by the contemporaneous November 2009 blog post by David Cohen, the reaction of internet advertising industry executive was not only one of surprise, but also of the profound impact the invention would have on the internet advertising industry.

54.    The RMC invention had precisely the impact Mr. Cohen foresaw.  Again as a matter of historical fact, the online advertising industry coalesced around the need to replace what used to be called "served impressions" of ads with a new standard called the "viewable impression" as the very measurement on which advertisers would be charged. The evidence of this historical fact is overwhelming and includes the 2013 IAB Annual Report, advisories issued by the Media Ratings Council (the "MRC"), and historical webpages from the Making Measurement Make Sense initiative.

55.    The evidence falls squarely within the key objective indicia.  For example, the industry documentation of the need to replace the "served impression" with the "viewable impression" is quintessential "long felt need."   Upon learning that a viewable impression was technically possible, the industry came together to adopt it as a standard.  The industry felt the need to change to a standard based on RMC's invention.  This factor is of significant weight that the invention was not obvious.

56.    To answer this long felt need, the MRC began a process of accrediting companies whose technologies could accurately determine viewable impressions (as opposed to served impressions).

57.    As a matter of historical fact, the first company accredited by the MRC as

COMPLAINT

being able to accurately determine viewable impressions (as opposed to served impressions) was RealVu LLC, a sister company of RMC that RMC set up to commercialize its inventions.

58.    The same documents demonstrate failure by others.  Against the backdrop of an industry pressing for a viewable impression standard – and engaging the MRC to oversee its adoption – the MRC had to issue an advisory *against* adopting the standard because of failure by others.

59.    For example, two years *after* it accredited RealVu's solution, the MRC ran a test with five different vendors reviewing 3 billion ad impressions, and found viewability test results that varied from 0% to 77%.  The MRC's independent, documented failure by others weighs significantly in favor of finding that this aspect of the invention was not obvious.

60.    industry recognition of RMC/RealVu's contribution includes other examples of commercial praise, including George Ivie's recognition that "RealVu essentially invented viewability" and the MRC's stating the following when RealVu's accreditation was renewed:  "RealVu was the first company to apply for and gain MRC accreditation for a viewability solution, and in so doing, it helped to revolutionize the direction of digital advertising.  Its latest accreditation achievements demonstrate RealVu's continued commitment to industry leadership.

61.    The IAB used similar language in its 2013 Annual Report, indicating that the change to a viewable impression standard was "revolutionary."

COMPLAINT

62.    The industry credits RMC/RealVu with inventing a viable viewability test that led to a revolution in the way ads were accounted for.  This commercial praise and industry recognition is yet another factor that should be given significant weight to find the invention non-obvious.

63.    The claims at issue in this case use the viewability test as a necessary predicate to refreshing a viewable ad space with a new ad.

64.    There is also extensive evidence of commercial success, licensing, and copying.

65.    RealVu's content rendering and control product embodies the claimed invention and are coextensive with it. Since the time the solution was introduced, RealVu has generated more than $30 million from its content rendering and control service.

66.    RealVu's commercial success, while relevant as an objective indicia of non-obviousness, is small compared to the overall commercial success of the invention.

67.    One aspect of the RMC inventions can be described as "ad refresh."  This is the process of replacing an ad in an ad space in response to a determination that the ad space is within the viewport of a user's device and the ad space has been visible for a sufficient period of time that a new ad can refresh the space.  Internet users encounter this process all the time.  They have a webpage open and an old ad is refreshed with a new one.

68.    What many internet users experiencing an ad refresh may not realize is that, behind the scenes, a flurry of activity occurs. First, the system determines that an ad space (or a significant enough portion of one) has been in the user's viewport for a long enough

COMPLAINT

time that an ad refresh is appropriate.  Next, in response to that determination, the system sends a communication to ad servers to refresh the ad.  In some instances, the ad server serves another ad.  In other, the ad server conducts a real-time auction to determine which new ad should refresh the old one.  This is sometimes referred to as "real-time bidding" or RTB.

69.    The specific process described in the preceding paragraph is rooted in technology, was invented by RMC, and is lies at the heart of the "ad refresh" business of the Internet.

70.    By one rough estimate, the "ad refresh" aspect of the invention may be responsible for generating $24-42 billion or more per year in internet advertising. This estimate was made using a generative AI system (Anthropic's Claude Sonnet 4.0 model) that sites several reliable sources in making the estimate.  A copy of the output, including the sources it relies upon (all of which have been verified as linking to actual websites that contain the cited information) is attached as Exhibit G.

71.    The estimate starts with two data points provided by Statista and eMarketer: that so-called "programmatic digital display advertising" accounts for roughly 91% of all digital display advertising, a market that totals approximately $157-168 billion in 2024.

72.    According to two other sources (Pubstack and Relevant-digital), publishers implementing ad refresh strategies see revenue uplifts ranging from 5-10% to 30-40%.

73.    Using an estimate in the middle of those ranges, 15-25%, results in estimated revenue of $24-42 billion annually in the US from ad refresh/rotation.

74.     Discovery will confirm whether, and to what extent, ad refresh technologies are used by MediaNews and the amount of incremental revenue they have generated.

75.     In addition to ad refresh solutions developed by RealVu and those that are used at publishers like MediaNews, at least one other company was established with the sole purpose of placing ads in response to a determination that the ads would only be placed after a determination that the ad space was in the viewport of a user's computer.  That company, Duration Media, initially did not have its own technology and instead licensed the technology from RMC.  This licensing is another objective indicia of non-obviousness.

76.     Duration Media's commercial success using technology licensed from RMC is another objective indicia of non-obviousness.

77.     After initially licensing RealVu's solution, Duration copied the functionality of the services it had previously purchase from RealVu.  Such copying is another objective indicia of non-obviousness.

78.     To date, RMC has entered license agreements regarding use of its patented technology with several companies.  These licenses are additional objective indicia of non-obviousness.

## MediaNews and the Accused Activity

79.     According to website, "The MediaNews Group network publishes 77 daily and more than 150 weekly publications throughout the United States, including The Denver Post, The Bay Area's The Mercury News, The Orange County Register, Saint Paul Pioneer Press, Boston Herald, and The San Diego Union-Tribune. In print and online, our

COMPLAINT

publications reach a combined audience of more than 47.2 million every month."

https://www.medianewsgroup.com/about-us/

80.    On information and belief, MediaNews owns and operates the following publications and accompanying websites in California:

Northern California
- The Mercury News (San Jose) – mercurynews.com
- East Bay Times (Walnut Creek) – eastbaytimes.com
- Marin Independent Journal (San Rafael) – marinij.com
- Times-Standard (Eureka) – times-standard.com
- Chico Enterprise-Record (Chico) – chicoer.com
- Monterey Herald (Monterey) – montereyherald.com
- Press Democrat (Santa Rosa) – pressdemocrat.com (acquired May 2025)

Southern California News Group (SCNG)
- Los Angeles Daily News (Los Angeles) – dailynews.com
- The Orange County Register (Santa Ana) – ocregister.com
- The San Diego Union-Tribune (San Diego) – sandiegouniontribune.com
- Inland Valley Daily Bulletin (Ontario) – dailybulletin.com
- San Gabriel Valley Tribune (West Covina) – sgvtribune.com
- The Press-Enterprise (Riverside) – pe.com
- Pasadena Star-News (Pasadena) – pasadenastarnews.com
- Redlands Daily Facts (Redlands) – redlandsdailyfacts.com
- Whittier Daily News (Whittier) – whittierdailynews.com
- Long Beach Press-Telegram (Long Beach)- presstelegram.com
- Daily Breeze (Hermosa Beach) – dailybreeze.com

81.    The Patents-in-Suit cover three different ways MediaNews displays ads on at least some of the many different websites MediaNews owns and operates.

COMPLAINT

82.     The '074 Patent and the '453 Patent include claims where websites determine whether an ad space is outside of, but nearing, the viewport, in which case ads are inserted into the ad space as it nears the viewport.  A common industry term for this process is "lazy loading," and MediaNews websites that incorporate this feature are the Accused Lazy Loading Websites (including at least denverpost.com).

83.     One of the Patents-in-Suit, the '482 Patent, includes claims where the websites determine whether a sufficient percentage of an ad space is in the viewport and, if so, to initiate an ad refresh of the ad space. MediaNews websites that incorporate this feature (including at least denverpost.com) are the Accused Ad Refresh Websites.

84.     Two of the Patents-in-Suit, the '090 Patent and the '453 Patent include claims that require use of both the lazy loading feature and the ad refresh feature. MediaNews websites the incorporate both features (including at least denverpost.com) are the Accused Lazy Loading and Ad Refresh Websites.

85.     On September 22, 2023, RMC sent a notice of patent infringement letter to MediaNews regarding its infringement of U.S. Patent Nos. 11,443,329, 11,468,453, and 11,741,482. The letter included detailed claim charts for each infringed claim.

86.     MediaNews acknowledged receipt of the materials on October 9, 2023, and brief discussion occurred with outside counsel for MediaNews, but meaningful license negotiations have not taken place.

87.     To date, MediaNews has not entered into a license agreement with RMC.

## **Count I: Infringement of U.S. Patent No. 9,824,074**

88.     RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

89.     MediaNews directly infringes at least claim 16 of the '074 Patent by practicing the method set forth in the claim on each of the Accused Lazy Loading Websites:

| Claim 16 | The Accused Lazy Loading Websites |
|---|---|
| 16. A method comprising: | Not necessarily a claim limitation, but the Accused Lazy Loading Websites practice the claimed method. |
| [16(a)] determining, by code executed by a computing system, whether a pre-defined area on a content page in which content is to be rendered is at least partially within a visible area of an application window on a display device by comparing coordinates of the pre-defined area with coordinates of the application window, the pre-defined area comprising a placeholder location on the content page in which content is to be rendered; | The Accused Lazy Loading Websites, determine whether at least a portion of a pre-defined area (for example, a placeholder for an ad display area) of a content page is within the viewport by comparing the coordinates of the pre-defined area with coordinates of the web browser window. |
| [16(b)] determining, by the code executed by the computing system, whether the pre-defined area on the content page in which content is to be rendered is completely outside of the visible area of the application window and is also within a distance outside of the visible area of the application window by comparing the coordinates of the pre-defined area with the coordinates of the application window; | The Accused Lazy Loading Websites also determine whether the pre-defined area (for example, a placeholder for an ad display area) of a content page is completely outside the viewport but also sufficiently close to the viewport by comparing the coordinates of the pre-defined area with coordinates of the web browser window. |

COMPLAINT

| Claim 16 | The Accused Lazy Loading Websites |
|---|---|
| [16(c)] transmitting, by the code executed by the computing system, one or more indications selected from the group consisting of:<br><br>an indication that the pre-defined area is at least partially within the visible area of the application window;<br><br>an indication that the pre-defined area is outside the visible area of the application window; and an indication that the pre-defined area is within the distance outside of the visible area of the application window; | The Accused Lazy Loading Websites, after determining that the pre-defined area(s) are at least partially within the viewport or outside but close to the viewport, transmit code identifying those predefined area(s) the Accused Lazy Loading Websites have so determined. |
| [16(d)] in response to determining that the pre-defined area on the content page in which content is to be rendered is at least partially within the visible area of the browser window, provide instructions to:<br><br>retrieve one or more content files; and<br><br>render the one or more content files in the pre-defined area on the content page in which content is to be rendered; and | The servers running the Accused Lazy Loading Websites, based on determining that the pre-defined area is at least partially within the viewport but is also close to it, provide instructions to retrieve and render content (an ad, for example) |
| [16(e)] in response to determining that the pre-defined area on the content page in which content is to be rendered is completely outside of the visible area of the browser window and is also within the pre-defined distance outside of the visible area of the browser window, provide instructions to: | The servers running the Accused Lazy Loading Websites, based on determining that the pre-defined area is completely outside the viewport but is also close to it, provide instructions to retrieve and render content (an ad, for example) |

COMPLAINT

| Claim 16 | The Accused Lazy Loading Websites |
|---|---|
| retrieve the one or more content files; and<br><br>render the one or more content files in the pre-defined area on the content page in which content is to be rendered. | |

90.    RMC is only asserting infringement of the method claims of the '074 Patent, resulting in MediaNews being liable for infringement of the '074 for the period starting six years prior to the filing of this Complaint until the '074 expires or MediaNews's infringement stops.

91.    RMC has suffered and is suffering damages as a result of MediaNews's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

## **Infringement of U.S. Patent No. 11,004,090**

92.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

93.    MediaNews directly infringes at least claim 23 of the '090 Patent by practicing the method set forth in the claim on each of the Accused Lazy Loading and Ad Refresh Websites:

| Claim 23 | The Accused Lazy Loading and Ad Refresh Websites |
|---|---|
| 23. A method comprising: | Not necessarily a claim limitation, but |

COMPLAINT

| Claim 23 | The Accused Lazy Loading and Ad Refresh Websites |
|---|---|
| | the Accused Lazy Loading and Ad Refresh Websites practice the claimed method. |
| [23(a)] designating, by one or more computing systems, a first predetermined area on an ad content page; | The Accused Lazy Loading and Ad Refresh Websites determine a first predetermined area of an ad content page, e.g., the "placeholder" area for the display of advertisements. |
| [23(b)] providing that, in response to a request, the ad content page with a designation of the predefined area and associated instructions in the form of code are served to a remote computing device operating a browser and displaying a browser window; | The Accused Lazy Loading and Ad Refresh Websites operate by responding to requests (typically in the form of a url for a website) by sending the requested webpage to the remote computing device (i.e., the user's computer) that is operating a web browser and displaying a browser window. |
| [23(c)] providing that the remote computing device determines whether the predefined area is within a predefined distance outside a visible area of the browser window and that in at least partial response to such determination a first ad content is served to the remote computing device and rendered in the first predetermined area; and | The code running on the Accused Lazy Loading and Ad Refresh Websites on the user's computer determines that the predefined area is outside the viewport but is also close to it. In response to that determination, the Accused Websites serve an ad to the user's computer which is rendered in the ad placeholder area (i.e., "lazy loading"). |
| [23(d)] wherein the instructions are configured, in conjunction with the browser to direct the computing device to:<br><br>periodically determine whether the first predetermined area is in view within the visible area of the browser | In addition to lazy loading ads, the Accused Lazy Loading and Ad Refresh Websites also monitor how long the ad placeholder has been within the viewport and once a threshold period of time has passed, the Accused Lazy Loading and Ad Refresh Websites send a request to a server operating the |

| Claim 23 | The Accused Lazy Loading and Ad Refresh Websites |
|---|---|
| window on the remote computing device; and<br><br>in response to determining that the first predetermined area has been in view within the visible area of the browser window for a predefined time, send a communication to one or more server computing systems; | Accused Lazy Loading and Ad Refresh Websites (i.e., a request for a "second print" ad) |
| [23(e)] providing that the one or more server computing systems are configured to:<br><br>receive the communication from the computing device; and<br><br>in response to receiving the communication from the remote computing device, select a replacement advertisement to display on the page;<br><br>serve the replacement advertisement to the remote computing device; and<br><br>the method further providing that the instructions in conjunction with the browser cause that the replacement advertisement is rendered in the first predetermined area. | The servers running the Accused Lazy Loading and Ad Refresh Websites receive the communication that an ad area is ready for an ad refresh, after which a replacement ad is served to the user's computer, where it is rendered in the ad placeholder area. |

94.    RMC is only asserting infringement of the method claims of the '090 Patent, resulting in MediaNews being liable for infringement of the '090 for the period starting when the '090 Patent issued (May 4, 2021) until it expires or MediaNews's infringement

COMPLAINT

stops.

95.    RMC has suffered and is suffering damages as a result of MediaNews's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

## Count III: Infringement of U.S. Patent No. 11,468,453

96.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

97.    MediaNews directly infringes at least claim 5 of the '453 Patent by practicing the method set forth in the claim on each of the Accused Lazy Loading and Ad Refresh Websites.  Detailed claim charts explaining the basis for infringement for two of the Accused Lazy Loading and Ad Refresh Websites was sent to MediaNews with the notice of infringement letter sent on August 22, 2023.  The chart is attached as Exhibit H and is hereby incorporated by reference.

98.    RMC is only asserting infringement of the method claims of the '453 Patent, resulting in MediaNews being liable for infringement of the '453 Patent for the period from when the '453 Patent issued (October 11, 2022) until it expires or MediaNews's infringement stops.

99.    RMC repeatedly reached out to MediaNews to follow up regarding the infringement notice.

100.    At no time did MediaNews make a proposal to license the '453 Patent from RMC.

COMPLAINT

101.    RMC has suffered and is suffering damages as a result of MediaNews's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

102.    MediaNews's deliberate and willful refusal to participate in voluntary licensing negotiations means that the only method by which RMC can be compensated for MediaNews's practicing methods covered by the '453 Patent is via litigation to enforce RMC's patent rights.

103.    MediaNews's infringement of the '453 Patent, particularly in light of its refusal to engage in licensing negotiations, is therefore willful and deliberate, entitling RMC to increased damages under 35 U.S.C. § 284.

104.    MediaNews's conduct is also exceptional, entitling RMC to recover its attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## **Count IV: Infringement of U.S. Patent No. 11,741,482**

105.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

106.    MediaNews directly infringes at least claim 1 of the '482 Patent by practicing the method set forth in the claim on each of the Accused Ad Refresh Websites. Detailed claim charts explaining the basis for infringement for two of the Accused Ad Refresh Websites was sent to MediaNews with the notice of infringement letter sent on August 22, 2023.  The chart is attached as exhibit I and is hereby incorporated by reference.

COMPLAINT

107.    MediaNews is liable for infringement of the '482 Patent for the period September 22, 2023 until it expires or MediaNews's infringement stops.

108.    RMC repeatedly reached out to MediaNews to follow up regarding the infringement notice.

109.    At no time did MediaNews make a proposal to license the '482 Patent from RMC.

110.    RMC has suffered and is suffering damages as a result of MediaNews's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

111.    MediaNews's deliberate and willful refusal to participate in voluntary licensing negotiations means that the only method by which RMC can be compensated for MediaNews's practicing methods covered by the '482 Patent is via litigation to enforce RMC's patent rights.

112.    MediaNews's infringement of the '482 Patent, particularly in light of its refusal to engage in licensing negotiations, is therefore willful and deliberate, entitling RMC to increased damages under 35 U.S.C. § 284.

113.    MediaNews's conduct is also exceptional, entitling RMC to recover its attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

### Count V: Infringement of U.S. Patent No. 12,125,051

114.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

115.    MediaNews directly infringes at least claim 1 of the '051 Patent by making, using, and selling Accused Ad Refresh Websites that incorporate the claimed computer program:

| Claim 1 | The Accused Ad Refresh Websites |
|---|---|
| 1. [preamble] A computer program product for rendering advertisement content in an ad content display page, | Not necessarily a claim limitation, but MediaNews makes Accused Ad Refresh Websites include the claimed computer program for rendering ads on webpages. |
| [preamble.1] wherein the ad content display page includes (i) a predefined area configured to display advertisement content, the predefined area being a portion of the ad content display page, and (ii) page content displayed in other portions of the ad content display page, the page content being separate from the advertisement content, the ad content display page being scrollable to allow a portion of the ad content display page to appear in a visible area of a browser window of a browser that is configured to be operated by a remote computing device, | Not necessarily a claim limitation, but the Accused Ad Refresh Websites comprise ad content display pages (webpages) that include predefined areas (ad placeholder areas) that are subparts of the webpages that also include other content that is separate from the ad content.  The webpages can be scrolled such that a portion of the page appears in a visible area (the viewport) of a browser window on a user's computer. |
| [preamble.2] the computer program product comprising a non-transitory computer readable medium tangibly embodying computer-executable program instructions thereon that, when executed, cause one or more computing devices to: | Not necessarily a claim limitation, but the Accused Ad Refresh Websites operate through stored computer instructions |
| (a) determine whether a predefined portion of the predefined area of the ad | The Accused Ad Refresh Websites determine whether a predefined portion |

| Claim 1 | The Accused Ad Refresh Websites |
|---|---|
| content display page is in the visible area of the browser window; and | of the ad placeholder areas are in the viewport. |
| (b) in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window, cause a communication to be sent from the remote computing device to one or more dispatcher servers,<br><br>wherein the one or more dispatcher servers include computer-executable program instructions thereon that, when executed:<br>(i) receive the communication, and<br>(ii) cause advertisement content to be served to the remote computing device, | In response to the above determine, the Accused Ad Refresh Websites send a communication to one or more dispatcher servers. |
| (b)[.1] wherein the one or more dispatcher servers include computer-executable program instructions thereon that, when executed:<br><br>  (i) receive the communication, and<br><br>  (ii) cause advertisement content to be served to the remote computing device, | The servers receive the communication and cause ads to be served to the user's computer. |
| [c] wherein the browser is configured to render the advertisement content in the predefined area of the ad content display page, and | The Accused Ad Refresh Websites render the ads in the ad placeholder areas. |
| [d] wherein the advertisement content first appears in the predefined area of the ad content display page only after | The ad selected in the process above only appears after it has been served by the servers. |

| Claim 1 | The Accused Ad Refresh Websites |
|---|---|
| the one or more dispatcher servers serve the advertisement content to the remote computing device and the browser renders the advertisement content in the predefined area of the ad content display page. | |

116.   MediaNews being liable for infringement of the '051 Patent from the date of the service of the Complaint until the '051 Patent expires or MediaNews's infringement stops.

117.   RMC has suffered and is suffering damages as a result of MediaNews's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

## **Jury Demand**

RMC demands a trial by jury on all issues that may be so tried.

## **Request For Relief**

WHEREFORE, Plaintiff RMC requests that this Court enter judgment in its favor and against Defendant MediaNews as follows:

A.   Adjudging, finding, and declaring that MediaNews has infringed the Patents-in -Suit, under 35 U.S.C. § 271;

B.   Awarding past damages arising out of MediaNews's infringement of the Patents-in-Suit to RMC either in the amount of RMC's lost profits or in an amount no less than a reasonable royalty, together with prejudgment and post-judgment interest, in an

COMPLAINT

amount according to proof;

C.    Adjudging, finding, and declaring that MediaNews's infringement is willful and awarding enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

D.    Awarding attorneys' fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law;

E.    Entering an injunction preventing MediaNews from continuing to infringe the Patents-in-Suit;

F.    Granting RMC such other further relief as is just and proper, or as the Court deems appropriate.

Dated: August 19, 2025                    Respectfully submitted,

*/s/ Gregory Markow*
Gregory Markow (State Bar No. 216748)
gmarkow@cgs3.com
Crosbie Gliner Schiffman Southard &
Swanson LLP (CGS₃)
12750 High Bluff Dr., Suite 250
San Diego, California 92130
Telephone: (858) 367-7676

David Berten (to be admitted *Pro Hac Vice*)
IL Bar # 6200898
dberten@giplg.com
Alison Aubry Richards (to be admitted *Pro Hac Vice*)
IL Bar # 6285669
arichards@giplg.com
Global IP Law Group, LLC

COMPLAINT

55 West Monroe Street, Suite 3400
Chicago, IL 60603
Telephone: (312) 241-1500

*Attorneys for Plaintiff Rich Media Club, LLC*

35

COMPLAINT

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)   PLAINTIFFS | DEFENDANTS |
|---|---|
| RICH MEDIA CLUB LLC, | MEDIANEWS GROUP, INC. |

| (b)   County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant _____ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c)   Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Gregory Markow, Crosbie Gliner Schiffman Southard & Swanson LLP (CGS3), 12750 High Bluff Dr., Suite 250, San Diego, California 92130 | |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☒ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. § 271

Brief description of cause:
Patent Infringement

## VII.  REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 08/19/2025 | /s/Gregory Markow |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# EXHIBIT A

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/803,779 | 05/16/2007 | Brad Krassner | RV D3 US CIP | 7141 |

93220        7590        12/18/2018

Jones IP Group
2500 Dallas Parkway
Suite 550
Plano, TX 75093

| EXAMINER |
|---|
| CHOI, PETER H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3622 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/18/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

docket@jonesip.com
eofficeaction@appcoll.com

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* BRAD KRASSNER, NIKOLAI MENTCHOUKOV,
FRED BERNSTEIN, and ALAN EDWARDS[1]

———————

Appeal 2017-010139[2]
Application 11/803,779[3]
Technology Center 3600

———————

Before ALLEN R MACDONALD, JAMES B. ARPIN, and
NABEEL U. KHAN, *Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge.*


I.    DECISION ON APPEAL

Appellants appeal under 35 U.S.C. § 134(a), the Examiner's decision
rejecting claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37.
Final Act. 2, 3; App. Br. 1.  Claims 3, 6, 8, 14, 19, 22, 26–30, 32, and 34 are

---

[1] According to Appellants, Rich Media Club, LLC is the real party-in-interest.  App. Br. 2.

[2] In this Decision, we refer to Appellants' Appeal Brief ("App. Br.," filed October 5, 2016) and Reply Brief ("Reply Br.," filed July 24, 2017); the Final Office Action ("Final Act.," mailed April 5, 2016); the Examiner's Answer ("Ans.," mailed May 22, 2017); and the originally filed Specification ("Spec.," filed May 16, 2007).

[3] This application is a continuation-in-part of U.S. Patent Application No. 11/643,245, which is the subject of Appeal No. 2017-009980.  Spec. 1.

Appeal 2017-010139
Application 11/803,779

cancelled. App. Br. 26–31 (Claims App'x). We have jurisdiction under 35 U.S.C. § 6(b).

We reverse.

## II.    STATEMENT OF THE CASE

The recited systems and methods relate to:

creating electronic advertisements using licensed digital content, and distributing such advertisements for display at desired network locations, including on multiple networks (such as, without limitation, computer networks such as the Internet as well as cellular, wireless, cable, satellite and other networks), whereby the ad to be displayed at a particular network location is selected from a group of ads that reference the same keyword or category and network location via an auction when the display location is acted upon by a network user/ad viewer. The digital content is delivered to designated advertising locations on the network and becomes part of an advertising display composed at the time requested by the network user/ad viewer by using a relational database for storing data required for commands that execute retrieval, assembly and dispatching of the licensed digital content files previously stored in one or more servers, as well as messaging, tracking, display, and billing for both use of the licensed content and display of the ad at the designated location on a cost-per-use basis. Third parties that make their digital content available for licensing and the publishers that display the advertisements on their network locations are automatically paid via the system each time an ad is displayed using their content and ad space, respectively. Ad publishers can participate in a barter-based ad exchange network wherein ad publishers can exchange advertising impressions/views in their publication (whether online or other) for impressions/views of their advertisements via the network.

Spec. ¶ 10.

As noted above, claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37 are pending. Claims 1 and 18 are independent. App. Br. 25–

2

Appeal 2017-010139
Application 11/803,779

26, 39 (Claims App'x).  Claims 2, 4, 5, 7, 9–13, 15–17, 25, 31, and 35–37

depend directly or indirectly from claim 1; and claims 20, 21, 23, 24, and 33

depend directly or indirectly from claim 18.  *Id.* at 26–28, 30–32.

Claim 1, reproduced below, is illustrative.

1.  A system comprising:

a electronic database configured to store a plurality of records
comprising:

> one or more commands for retrieving one or more of a
> plurality of electronic content files designated by one or
> more advertiser users;
> *one or more commands for assembling and presenting the
> one or more designated electronic content files as an
> electronic advertisement at one or more of a plurality of
> webpages*; and
> one or more parameters for presentation of the electronic
> advertisement at the one or more webpages; and

one or more computing systems operable to:

> generate, in response to one or more options selected by a
> particular one of the one or more advertiser users in a user
> interface, first code for placement at a particular one of the
> webpages, the first code written to cause a billboard
> module to be loaded when the particular webpage is
> loaded, the billboard module comprising second code
> written to:
>
>> communicate, over one or more computer networks,
>> with the one or more computing systems; and
>>
>> retrieve and display one or more advertisements on the
>> particular web page;
>
> select, in response to a communication from the billboard
> module over the one or more computer networks, a subset
> of the plurality of records stored in the database, the
> selection based at least in part on one or more keywords in
> the communication from the billboard module;

3

Appeal 2017-010139
Application 11/803,779

> after selecting the subset of the plurality of records based at least in part on the one or more keywords in the communication from the billboard module, *conduct an auction to select a winning advertisement from the selected subset of records*;
>
> *provide instructions to the billboard module for the billboard module to retrieve the winning advertisement and present the winning advertisement in an area on the particular webpage designated by the billboard module*; and
>
> *provide an interface for a webpage provider to contribute one or more advertising views/impressions on one or more webpages of the webpage provider in barter exchange for one or more advertising views/impressions on one or more webpages of another webpage provider.*

*Id.* at 25–26 (disputed limitations emphasized); *see id.* at 28 (claim 16 (reciting "barter transactions"); claim 17 (reciting "a pool of available advertising impressions/views.")), 31 (claim 25 (reciting "the right to display" given "in exchange for the contributed advertising views/impressions.")); *see also* Spec. ¶ 110 ("[A]d publishers can participate in a barter-based advertising exchange network wherein ad publishers can exchange advertising impressions/views in their publication (whether online or other) for impressions/views of their own advertisements at third party publisher network locations."), Figs. 44–50 (depicting "Ad Swap Program" embodiment).

Appeal 2017-010139
Application 11/803,779

## III.   REFERENCES

The Examiner relies upon the following prior art in rejecting the pending claims:

| | | |
|---|---|---|
| Patel *et al.* ("Patel") | US 7,962,363 B2 | Issued June 14, 2011; Published May 27, 2004 |
| Scholl *et al.* ("Scholl") | US 8,447,651 B1 | Issued May 21, 2013; Filed Jan. 25, 2005 |

## IV.   THE REJECTIONS

Claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37 are rejected under 35 U.S.C. § 101 because the claimed invention is directed to a judicial exception (i.e., a law of nature, a natural phenomenon, or an abstract idea) without significantly more.  Final Act. 2–3.  Claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37 also stand rejected under 35 U.S.C. § 103(a) as rendered obvious over the combined teachings of Patel and Scholl.  *Id.* at 3–10.

Unless otherwise indicated, we adopt the Examiner's findings in the Answer as our own and add any additional findings of fact appearing below for emphasis.  We address these rejections below.

A. *Patent Eligible Subject Matter*

Under 35 U.S.C. § 101, a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  The U.S. Supreme Court has "'long held that this provision contains an important implicit exception:  Laws of nature, natural phenomena, and abstract ideas are not patentable.'"  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

5

Appeal 2017-010139
Application 11/803,779

The Court in *Alice* reiterated the two-step framework previously set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 75–79 (2012), "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. The first step in that analysis is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts," such as an abstract idea. *Id.*

The Court acknowledged in *Mayo* "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. Ct. at 71. We, therefore, look to whether the claims focus on a specific method or means that improves the relevant technology or are directed instead to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016). If the claims are not directed to an abstract idea, the inquiry ends. *Id.* at 1339. Otherwise, the inquiry proceeds to the second step where the elements of the claims are considered "individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 566 U.S. at 78, 79). That is whether the claims recite elements making the claims *significantly more* than the judicially excepted subject matter.

With regard to the first step of the *Alice* analysis, the Examiner determines that "[c]laim(s) 1-2, 4-5, 7, 9-13, 15-18, 20-21, 23-25, 31, 33 and 35-37 is/are directed to the abstract idea of: providing an online advertising auction platform" and, in particular, to "**providing an online advertising**

6

Appeal 2017-010139
Application 11/803,779

**platform and conducting an auction**." Final Act. 2, 11–12.  With regard
to the second step of the *Alice* analysis, the Examiner further finds that
"[t]he claim(s) does/do not include additional elements that are sufficient to
amount *to significantly more* than the judicial exception because the
additional elements of 'retrieving..., assembling... and presenting...' are
merely instructions to implement the idea on a general computer." *Id.* at 2
(emphasis added).  Referring to claim 1, the Examiner finds that each of the
additional limitations to the identified abstract idea, namely, including one
or more commands in the database, generating a first code to be uploaded
with a particular webpage, communicating between computer systems,
retrieving and displaying an advertisement on a webpage, selecting a records
subset based on keywords, providing instructions to retrieve and present the
auction winning advertisement, and providing an interface for a webpage
provider to contribute one or more advertising views/impressions in barter
exchange for one or more advertising views/impressions of another webpage
provider, are themselves no more than abstract ideas. *Id.* at 12–14 (citing
*SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950 (Fed.
Cir. 2014); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014);
and *Cyberfone Sys., LLC v. CNN Interactive Grp, Inc.*, 558 F. App'x 988
(Fed. Cir. 2014)); *see also* Ans. 4–7 (adding citations to *Classen
Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057 (Fed. Cir. 2011) and
*Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)).
The Examiner determines that:

> Generic computers performing generic computer functions,
> alone, do not amount to significantly more than the abstract idea.
> *Considered individually*, the steps of **receiving and retrieving
> electronic content, assembling and presenting electronic**

7

Appeal 2017-010139
Application 11/803,779

> **content, generating information providing an interface and conducting an auction**[ f]urther describe the abstract idea but do not make it less abstract. . . . *Considered as a whole*, the recited steps merely organize the abstract idea into a stepwise description of a process used to perform the abstract idea and amount to no more **conducting an online auction, receiving electronic content and applying parameters to assemble and display electronic content**. The claim merely instructs the practitioner to implement the concept of **providing an interface, conducting an online auction, receiving electronic content and applying parameters to assemble and display electronic content** with routine, conventional activity specified at a high level of generality in a particular technological environment. When view[ed] either individual[ly] or as an order[ed] combination, the claim as a whole does not add significantly more to the abstract idea of **providing an online advertising auction platform**. As such, the claim is not patent eligible.

Ans. 7–8 (italics added).

Appellants contend, however, that the recited systems and methods are "necessarily rooted in computer technology because they address a problem that only arises in the realm of computer networks," and, therefore, are analogous to those found patent eligible in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). App. Br. 10–13; Reply Br. 2–4. Specifically, Appellants contend that certain features of the claims "address the problem of minimizing the network and computational resources needed to facilitate presenting advertisements on webpages. This problem has no pre-computer analog . . . ." App. Br. 11.

In *DDR Holdings*, the Federal Circuit noted that "[a]lthough the claims address a business challenge (retaining website visitors), it is a challenge particular to the Internet." *DDR Holdings*, 773 F.3d at 1257. Like other cases in which the Federal Circuit found the claims patent ineligible,

8

Appeal 2017-010139
Application 11/803,779

the claims in *DDR Holdings* "involve both a computer and the Internet." *Id.*

However, the Federal Circuit found that that the claims in *DDR Holdings:*

> stand apart because they do not merely recite the performance of
> some business practice known from the pre-Internet world along
> with the requirement to perform it on the Internet.  Instead, the
> claimed solution is necessarily rooted in computer technology in
> order to overcome a problem specifically arising in the realm of
> computer networks.

*Id.*  Here, the claims similarly recite a business challenge, i.e., placing the

appropriate advertisement on webpages retrieved as the result of a search,

but make clear that this problem is technological in nature, involving both

computers and the Internet.  App. Br. 10; *see* Spec. ¶¶ 7, 19.

> As the Specification explains:

> The present invention improves over prior advertising
> systems and methods in many ways.  The present invention does
> not embed advertising HTML files within a web page, providing
> considerable economies to advertisers in saved labor, time and
> cost in terms of both inserting advertisements into web page files,
> and later changing any of those advertisements.  The present
> invention functions totally transparently to a network user and
> which neither inconveniences nor burdens the user.  The present
> invention does not require a network user to download or install
> on the user's computer a separate application program
> specifically to receive advertising or perform any affirmative act
> other than normal browsing to receive such advertising.  The
> present invention also provides proper accounting to an
> advertiser, content licensor and ad publisher by accurately and
> validly ascertaining and tracking user click-
> throughs/impressions of fully rendered advertisements.  The
> present invention also allows ad publishers to maximize the
> revenues an increase effectiveness they receive from running
> third party ads, by being able to select for display (via the
> auction) the most profitable ads due to cost-per-click and click-
> through rate statistics.  The present invention allows advertisers
> to more accurately target their advertising on search engine

9

Appeal 2017-010139
Application 11/803,779

> websites by separating the advertising auction process from the
> search engine process, allowing for second generation relevancy.
> The present invention allows for optimization of advertising
> campaigns by allowing for real-time auctions for available
> advertising spots, taking into account the amount of available
> advertising spots at the time of the action, optimizing the value
> of the advertising spot at the time it is requested, and by allowing
> for the assembly of advertising *on the fly* for display on the
> network, and the ability to license quality digital media creative
> files on a cost effective cost-per-use basis, and update campaign
> parameter and creative according to campaign results derived *in
> real[-]time* by FSDC tracking.

Spec. ¶ 19 (emphases added); *see id.* ¶¶ 7 (discussing improvements over
past practices), 8 (defining "FSDC").  Appellants contend that the recited
system operations and method steps address the described problems and
achieve the sought improvements.  App. Br. 10–11.  The Examiner asserts,
however, that the claims do not recite *how* recited systems and methods
achieve the improvements identified in the Specification.  Ans. 2–3.  We
disagree.

    We are persuaded by Appellants' contentions that the claims are
rooted in computer technology.  For example, each independent claim
addresses the problem of inserting appropriate advertisements *into webpages*
based on stored parameters (App. Br. 25–26, 29 (Claims App'x (claims 1
and 18)); *see id.* at 26, 27, 30 (Claims App'x (claims 5, 9, 23, and 24))) and
recites "generat[ing], in response to one or more options selected by a
particular . . . advertiser user[] in a user interface, *first code* for placement
ata particular one of the webpages, *the first code written to cause a billboard
module to be loaded when the particular webpage is loaded*" (*e.g., id.* at 25
(Claims App'x (claim 1 (emphases added)))).  Further, each of the
independent claims recites that "*the billboard module* compris[es] *second*

10

Appeal 2017-010139
Application 11/803,779

*code* written to: communicate, over one or more computer networks, with
the one or more computing systems; and retrieve and display one or more
advertisements on the particular web page." *E.g.*, *id.* at 25 (Claims App'x
(claim 1 (emphases added))). Thus, the limitations reciting generation of
"first code" and "a billboard module" comprising "second code" indicate
that the recited systems and methods seek to solve problems rooted in
computer technology and arising in the context of advertising on webpages,
rather than advertising in media in general, and how the recited systems and
methods solve these problems.

In addition, dependent claim 2 recites that "the billboard module is
operable to transmit to the one or more computing systems *a tracking string*
as a message with *tracking data* regarding presentation of the displayed
advertisement." App. Br. 26 (Claim App'x (claim 2 (emphases added))); *see
id.* at 27 (Claims App'x (claim 10 (reciting "a tracking server"))). As the
Specification explains:

> The present invention allows advertisers to create their
> own advertisements and license quality third party digital content
> for use in creating their advertisements (and also for content
> creators and providers to market their content) with payment for
> licensing of such third party content and ad distribution based on
> a cost-per-click, cost-per-impression or other pay-as-used
> scheme and with clicks/usage of the licensed ad content being
> accurately trackable.

Spec. ¶ 12; *see id.* ¶¶ 17 ("The system serves the advertisement files in
addition to tracking impressions and click through rates in real time while
the advertisement runs."), 18 (linking the use of FSDC technology "to
process ad viewer activity tracking data"). The monitoring of such tracking
data, such as impressions and click through rates, relates to data generated
by viewing of advertisements *on a webpage*, which also seeks to solve

11

Appeal 2017-010139
Application 11/803,779

problems rooted in computer technology and arising in the context of
advertising on webpages, rather than advertising in media in general.

Accordingly, as in *DDR Holdings*, the claims recite "a solution to this
network-centric challenge," e.g., the efficient, timely, and cost effective
application of advertisements to webpages, for which there was no pre-
computer or pre-Internet analog.  App. Br. 10–11.  The Examiner provides
no evidence or persuasive argument to the contrary.  Thus, the claims here
recite "significantly more" than the abstract idea of "providing an online
advertising platform and conducting an auction."

The Examiner erred in finding the recited systems and methods patent
ineligible, and we do not sustain the Examiner's rejections under 35 U.S.C.
§ 101.

### B. Nonobviousness Over Patel and Scholl

The Examiner finds that claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–
25, 31, 33, and 35–37 are rendered obvious over the combined teachings of
Patel and Scholl.  Final Act. 3–10.  In particular, referring to claim 1, the
Examiner finds that Patel teaches or suggests a system including one or
more servers that store and dispatch one or more webpages on one or more
computers.  *Id.* at 3 (citing Patel, 10:4–11).  Further, the Examiner finds that
Patel teaches or suggests a database storing a plurality records, those records
including commands for retrieving and receiving one or more plurality of
electronic content files designated by one or more advertiser users,
commands for assembling and presenting the one or more designated
electronic content files (e.g., customized content) as an advertisement at one
or more plurality of webpages, and parameters (e.g., advertisement audience
demographics, location, keyword, type, and/or bid) for presentation of the

12

Appeal 2017-010139
Application 11/803,779

advertisement at the one or more webpages. *Id.* at 4 (citing Patel, 5:60–64, 9:50–54, 10:4–11, 10:35–47); *see also* Scholl, 3:52–65 (describing the use of "stop words" to notify selected advertisers), 6:42–67 (creating a "stop list" based on search terms to preclude certain advertisers from an auction).

The Examiner also finds that Patel teaches or suggests generating first code for placement at a particular one of the one or more webpages in response to one or more options selected by a particular one of the one or more advertiser users (e.g., advertisers) in a user interface. The first code may be written to cause a billboard module (*see* Spec. ¶ 88) to be loaded. Final Act. 4; Ans. 9 (citing Patel, 13:49–67, 14:44–67). In particular, Patel uses HTML IFRAME tags and JavaScript to identify certain areas of the webpages to receive advertisements, and the Examiner finds HTML IFRAME tags to be a type of computer coding. Ans. 9. Because the tags are for certain areas of the webpages, the Examiner finds these tags teach generating a first code for advertisement placement. Final Act. 4 (citing Patel, 14:44–59, 21:1–6). Further, Patel teaches or suggests that when the particular webpage is loaded, the call to JavaScript is second code that is written to communicate over one or more computer networks with the one or more computing systems and to retrieve and display one or more advertisements on the particular webpage. *Id.* at 5 (citing Patel, 15:5–55).

The Examiner finds that Scholl teaches or suggests the system actions of selecting a subset of the plurality of records in response to a communication from the billboard module over the one or more computer networks. Final Act. 5–6 (citing Scholl, 6:1–21, 3:37–38, 3:52–65); Ans. 10–11. The plurality of records subset is selected based "at least in part on one or more keywords in the communication from the billboard module."

13

Appeal 2017-010139
Application 11/803,779

Final Act. 6–7 (emphasis omitted); *see* Patel, 12:52–62, 13:49–55. Further, Scholl teaches or suggests that, after selecting the plurality of records subset, the system conducts an auction to select a winning advertisement from the selected subset of records. Final Act. 6–7 (citing Scholl, 4:39–45, 6:42–67, 8:51–9:9); Ans. 10–11. As a result, the combination of Patel and Scholl teaches or suggests that, as a result of the auction, the winning advertisement may be retrieved and presented. Patel, 18:34–41 (describing real-time auctions), 35:23–55 (describing media exchange via auction); Scholl 6:27–41 (describing dynamic bidding in response to search request); *see* Final Act. 7; Ans. 10–11.

The Examiner also finds that Patel teaches or suggests "provid[ing] an interface for a webpage provider to contribute one or more advertising views/impressions . . . on one or more webpages of the webpage provider in barter exchange . . . for one or more advertising views/impressions . . . on one or more webpages of another webpage provider." Final Act. 7–8 (emphasis omitted); Ans. 11. In particular, the Examiner finds that Patel teaches or suggests that a pool or plurality of creatives may be used for a "banner barter service." Final Act. 8; Patel, 12:25–42. Moreover, the Examiner finds that the recited "barter exchange" "allows advertisers and publishers *an alternative method* for ad display an optimizing benefits for ad distribution" (Ans. 11 (citing Spec. ¶¶ 9, 13, 14)) and that the "interface" recited in this limitation is "not a new or additional interface" (*id.* (citing Patel, 12:22–42, 19:42–44)).

The Examiner finds that because Scholl teaches that the search engine sends the invitation to advertisers to participate in the dynamic bidding, a person of ordinary skill in the art would understand that an auction would be

14

Appeal 2017-010139
Application 11/803,779

conducted *after* the search engine receives the user's search query. Final
Act. 6–7; Ans. 10–11; *see* Scholl, 4:39–44, 8:51–9:9 (describing search
query prompting dynamic bids). The Examiner further finds that a person of
ordinary skill in the art would have had reason to combine Scholl's teaching
regarding the dynamic bidding motivations and techniques (Scholl, 3:52–65,
4:39–44, 6:27–67) with Patel's teachings regarding the use of embedded
transparent pixels to communicate with the advertisement server (Patel
14:44–67), thus, giving a person of ordinary skill reason to program the
transparent pixel with code language and to initiate an auction. *See* Final
Act. 6–7; Ans. 10–11. "When there is a design need or market pressure to
solve a problem and there are a finite number of identified, predictable
solutions, a person of ordinary skill has good reason to pursue the known
options within his or her technical grasp." *KSR Int'l Co. v. Teleflex Inc.*, 550
U.S. 398, 421 (2007); *see* Patel, 2:31–58 (describing known problems with
the exchange of advertising media and the placement of advertisements on a
webpage); Scholl, 2:14–49 (describing known problems with search result
advertising bidding). Because Patel and Scholl are directed to advertising
selection, the Examiner finds that a person of ordinary skill in the art would
have had reason to combine their teachings to achieve the recited systems
and methods.

### 1. *Independent Claim 1*

Appellants disagree for at least three reasons. App. Br. 15–23; Reply
Br. 5–11. First, Appellants contend that Patel does not teach or suggest the
system action of generating first code for placement at a webpage in
response to one or more options selected by a user in a user interface. App.
Br. 16–17; Reply Br. 5–6. In particular, Appellants contend that the portions

15

Appeal 2017-010139
Application 11/803,779

of Patel, upon which the Examiner relies, may teach the use of HTML
IFRAME tags and JavaScript and activation of a throttling mechanism for
banner serving, but do not teach or suggest generating the claimed "first
code" in response to "one or more options selected by a particular one of the
one or more advertiser users in a user interface," as recited in claim 1.  App.
Br. 17.  We disagree.

 The Examiner finds that Patel teaches the use of HTML IFRAME tags
and JavaScript, which designates a section of the webpage at which
information will be displayed.  Ans. 9 (citing Patel, 14:44–67).  In particular,
Patel states that:

> if the consumer's browser supports the IFRAME tag, said tag is
> used.  If said browser does not support IFRAME tags, but does
> support JavaScript, *JavaScript is used to insert the HTML into
> the web page at the desired location*.  If said browser does not
> support JavaScript, *a default creative is selected for display*.

Patel, 14:45–51 (emphases added).  Patel explains that these methods are
used to achieve integration of the advertisement and the webpage.  *Id.*
at 14:21–33, 52–53.  The Examiner finds that the identification of the first
code is the HTML IFRAME tags and within that code is a call, i.e., *the
second code*, to initiate JavaScript running in the designated area of the
webpage to select the advertisement, which shows that a code is generated
for advertisement placement on a webpage.  Ans. 9.

 Appellants contend that, although the Examiner finds that "[t]he
advertiser [user] does have input or makes selections through the user
interface to make several options such as the ad id, targeting criteria, banner,
dimensions, etc. figs. 18-22 which gets matched to publisher" (*Id.*; *see* Patel,
Fig. 21 ("Banner Management Page")), "the Examiner does not explain how

16

Appeal 2017-010139
Application 11/803,779

or cite to any location in *Patel* that discloses that *Patel's* 'HTML Iframe tags' (equated to the claimed 'first code' by the Examiner) is generated '***in response to one or more options selected by a particular one of the one or more advertiser users in***' any of the webpages of figures 18-22" (Reply Br. 6). Referring to Figures 21 and 22, however, Patel explains how an advertiser user's input may manage or edit banner size and shape, including designating alternative tags. Patel, 25:6–61 ("'Banner Name' and 'Alt. Tag' are editable'" and "Define an Alternate Tag"). Because the Specification does not define–or even use– the term "first code" apart from the claims, we interpret it broadly and are persuaded that the Examiner has shown that Patel teaches or suggests this limitation.

Second, with respect to claim 1, Appellants contend that Patel does not teach or suggest a database comprising "***one or more commands for assembling and presenting the one or more designated electronic content files as an advertisement at one or more of a plurality of webpages.***" App. Br. 17–18; Reply Br. 7–8. In particular, Appellants contend that (1) the Examiner erroneously maps "[t]he call to the JavaScript" to *both* the billboard module, i.e., the second code, (*see* Ans. 9) and to commands for assembling and presenting the advertisement content (*see id.* at 9–10) and (2) the "commands for assembling and presenting" are part of the plurality of records stored on the database, and the Examiner has not shown that Patel teaches or suggests that the call to JavaScript is stored in the plurality of records. Reply Br. 7–8. We agree.

With respect to Appellants' contention regarding the mapping of the call to the JavaScript to *both* the billboard module and to the commands for assembling and presenting, we agree that the Examiner's mapping is

17

Appeal 2017-010139
Application 11/803,779

inconsistent.  Initially, we note that claim 1 recites the billboard module and the commands for assembling and presenting as separate elements.  App. Br. 25 (Claims App'x (claim 1)); *see id.* at 30 (Claims App'x (claim 20 (reciting "commands" and dependent from claim 18))).  Further, the Specification explains that, once the auction has determined the winning advertisement, the advertisement is displayed within the designated billboard module according to the commands contained in the relational database file for the winning advertisement.  Spec. ¶¶ 72, 73.  The Examiner's mapping is inconsistent with this disclosure.

In addition, although the claims do not recite where the billboard module is stored, the Examiner does not find that Patel teaches or suggests that the call for the JavaScript is stored with the plurality of advertisement records.  Final Act. 4–5; Ans. 9–10.  Therefore, we agree with Appellants that Examiner fails to show that Patel's call for the JavaScript teaches or suggests the commands for assembling and presenting stored in the plurality of records.  Reply Br. 7–8.

Appellants contend, "[f]or at least these reasons, independent Claim 1 and its dependent claims are allowable.  For at least certain analogous reasons, independent Claim 18 and its dependent claims also are allowable.  Accordingly, Appellants respectfully request reconsideration and allowance of all pending claims."  *Id.* at 6.  Because each of independent claim 1 recites that commands for assembling and presenting are stored in the plurality of records within a database and a separate billboard module, i.e., second code, we do not sustain the Examiner's rejections of claim 1 and the claims that depend therefrom.

18

Appeal 2017-010139
Application 11/803,779

Further, claim 20, which depends from independent claim 18, recites "storing in the plurality of stored records one or more of: . . . one or more commands for retrieving, assembling, and presenting the one or more content files and customized text content as an advertisement." App. Br. 30 (Claims App'x (claim 20)). Because claim 18 recites a billboard module, i.e., second code, in substantially the same manner as claim 1 , we conclude that Appellants' contentions regarding the Examiner's mapping of the call for the JavaScript apply equally to dependent claim 20, but not to independent claim 18 or to the other claims dependent therefrom.

### 2. *Independent Claim 18*

Because the Examiner's findings and Appellants' contentions with respect to all of the rejections are based on the application of the combined teachings of Patel and Scholl to the recitations of claim 1, we now consider Appellants' remaining contentions in so far as they apply to independent claim 18 and dependent claims 21, 23, 24, and 33. Appellants' third contention is that the combination of Patel and Scholl does not teach or suggest "provid[ing] [one or more] instructions to the billboard module for the billboard module to retrieve the winning advertisement and present the winning advertisement in an area on the particular webpage designated by the billboard module," as recited in claim 18. *See* App. Br. 19 (quoting claim 1). In particular, although Appellants acknowledge that Patel teaches the HTML IFRAME tag and Scholl teaches a search engine system, Appellants contend that the portions of Patel and Scholl, relied upon by the Examiner and quoted in the Reply Brief, fail to show instructions provided to the billboard module to retrieve and present the winning advertisement.

19

Appeal 2017-010139
Application 11/803,779

App. Br. 19–21; Reply Br. 8–10.  In the quoted portion of Scholl, Scholl states that:

> *Based in part on the notification response*, the search engine computer system composes a search result web page 112– also called a "search response"–potentially including an advertising message specified by the bid in the notification response.  This search result is returned to the client computer system for display.  Table 4 below shows a sample search response.

Scholl, 5:22–29 (emphasis added); *see* App. Br. 20.  Further, in the quoted portion of Scholl, Scholl states that:

> After performing steps **303** and **304**, the [software] facility continues in step **305**.  In step **305**, the facility selects one or more advertising bids for inclusion with the search result.  The selected advertising bids may be among the bids *received in the responses to the notification*, cached bids from responses to earlier notifications, and/or earlier received prospective bids.  Bids may be selected in a variety of ways, such as by highest bid amount, highest expected value based upon bid amount and historical performance of advertising messages from each advertiser, etc.

Scholl, 6:43–51 (emphasis added); *see* App. Br. 20.  Referring to Scholl's Figure 3, step 306 provides that the facility "repl[ies] to search request with response containing search result and advertising messages of selected advertising bids."  Scholl, Fig. 3; *see id.* at 6:51–55.  Patel teaches that, upon receipt of notification, *the search engine* retrieves and presents the winning advertisement and Scholl teaches that, upon receipt of notification, *the software facility* retrieves and presents the winning advertisement.  However, as discussed above, the Examiner finds that Patel's call to the JavaScript teaches the recited billboard module.  Thus, neither Patel nor Scholl, alone or together, teaches or suggests that *the billboard module*, after

20

Appeal 2017-010139
Application 11/803,779

being provided instructions, retrieves and presents the winning advertisement, as recited in claim 18.

In the Answer, the Examiner does not show where either Patel or Scholl, alone or in combination, teaches or suggests this limitation. Ans. 10–11; *see* Reply Br. 9–10. Thus, we are persuaded that the Examiner erred in rejecting claim 18 and claims 21, 23, 24, and 33 that depend therefrom, and we do not sustain those rejections.

3. *"barter exchange" limitation*

Each of independent claims 1 and 18 recites "provid[ing] an interface for a webpage provider to contribute one or more advertising views/impressions on one or more webpages of the webpage provider in barter exchange for one or more advertising views/impressions on one or more webpages of another webpage provider." *E.g.*, App. Br. 26 (Claims App'x (claim 1)). The Examiner finds that this is "an *alternative* method for ad display [and] optimizing benefits for ad distribution." Ans. 11 (emphasis added). However, the Examiner does not show where the claims recite or the Specification discloses that the barter exchange is an *alternative* method, instead of an *additional* method. *Id.* (citing Spec. ¶¶ 9, 13, 14); *see* Spec. ¶ 6 ("Additionally, advertisers and ad publishers would benefit greatly from having an ad space exchange system where publishers can make available their ad space/impression/view inventory in exchange not only for revenues from ad placements but alternately or also in exchange for ad space for their own ads placed at third party network locations, or other barterable commodities."). Because we reverse the rejections of the pending claims for other reasons, we do not address potential deficiencies in the Examiner's findings regarding this limitation of independent claims 1 and 18 further.

21

Appeal 2017-010139
Application 11/803,779

## V.    DECISION

For the above reasons, we reverse the Examiner's decision rejecting claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37.


## REVERSED

# EXHIBIT B

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 93220        7590        03/29/2019 | | |

Jones IP Group
2500 Dallas Parkway
Suite 550
Plano, TX 75093

| EXAMINER |
|---|
| WHITAKER, JONATHAN J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3622 | |

DATE MAILED: 03/29/2019

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/643,245 | 12/21/2006 | Brad Krassner | RV D2 US | 3941 |

TITLE OF INVENTION: System and method for creation, distribution and tracking of advertising via electronic networks

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0.00 | $0.00 | $500 | 07/01/2019 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450 | By fax, send to: | (571)-273-2885 |

---

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 93220 | 7590 | 03/29/2019 |

Jones IP Group
2500 Dallas Parkway
Suite 550
Plano, TX 75093

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

---

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/643,245 | 12/21/2006 | Brad Krassner | RV D2 US | 3941 |

TITLE OF INVENTION: System and method for creation, distribution and tracking of advertising via electronic networks

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0.00 | $0.00 | $500 | 07/01/2019 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| WHITAKER, JONATHAN J | 3622 | 705-014000 |

---

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐Issue Fee ☐Publication Fee (if required) ☐Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____     Date _____

Typed or printed name _____     Registration No. _____

PTOL-85 Part B (08-18) Approved for use through 01/31/2020     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/643,245 | 12/21/2006 | Brad Krassner | RV D2 US | 3941 |

93220      7590      03/29/2019

Jones IP Group
2500 Dallas Parkway
Suite 550
Plano, TX 75093

| EXAMINER |
|---|
| WHITAKER, JONATHAN J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3622 | |

DATE MAILED: 03/29/2019

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 11/643,245 | Applicant(s) Krassner et al. | |
|---|---|---|---|
| | Examiner JONATHAN J WHITAKER | Art Unit 3622 | AIA (FITF) Status No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>Patent Board Decision issued on 12/18/2018</u>.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____ .

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>1, 2, 4, 5, 7, 9-15, 17-19. 21, 23-35, 37, 38, 40-42, 46-53</u> . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   - a) ☐ All    b) ☐ Some    *c) ☐ None of the:
     1. ☐ Certified copies of the priority documents have been received.
     2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
     3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   - * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>05/12/2017</u>.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /J.J.W/ Examiner, Art Unit 3622 | /PETER H CHOI/ Supervisory Patent Examiner, Art Unit 3622 |
|---|---|

Application/Control Number: 11/643,245                                                    Page 2
Art Unit: 3622

### DETAILED NOTICE

#### *Status*

1.      This Allowability Notice is in response to the Patent Board Decision issued on December 18, 2018.  Claims 1, 2, 4, 5, 7, 9-15, 17-19, 21, 23-35, 37, 38, 40-42, and 46-53 are allowable.

2.      The present application was examined under the pre-AIA first to invent provisions.

#### *Response to Arguments*

3.      **A Summary of the Response to the Appellant's Arguments:**

        a.      Appellant's arguments, arguments, see Appeal Brief, filed October 5, 2016, with respect to the 35 U.S.C. 103 rejection of claims 1, 2, 4, 5, 7, 9-15, 17-19, 21, 23-35, 37, 38, 40-42, and 46-53 have been fully considered and, per the Patent Board Decision issued December 18, 2018, are persuasive.  The previous 35 U.S.C. 103 rejection of claims 1, 2, 4, 5, 7, 9-15, 17-19, 21, 23-35, 37, 38, 40-42, and 46-53 has been withdrawn

        b.      Appellant's arguments, arguments, see Appeal Brief, filed October 6, 2016, with respect to the 35 U.S.C. 103 rejection of claims 1, 2, 4, 5, 7, 9-15, 17-19, 21, 23-35, 37, 38, 40-42, and 46-53 have been fully considered and, per the Patent Board Decision issued December 18, 2018, are persuasive.  The previous 35 U.S.C. 103 rejection of claims 1, 2, 4, 5, 7, 9-15, 17-19, 21, 23-35, 37, 38, 40-42, and 46-53 has been withdrawn

        c.      Per the withdrawal of all rejections, the claims are allowable.

#### *Allowable Subject Matter*

4.      Claims 1, 2, 4, 5, 7, 9-15, 17-19, 21, 23-35, 37, 38, 40-42, and 46-53 are allowed.

Application/Control Number: 11/643,245                                              Page 3
Art Unit: 3622

5.      As allowable subject matter has been indicated, applicant's reply must either comply with all

formal requirements or specifically traverse each requirement not complied with.  See 37 CFR 1.111(b)

and MPEP § 707.07(a).

6.      The following is an examiner's statement of reasons for allowance: The Patent Board Decision

issued on December 18, 2018 determined that the examiner's arguments were unpersuasive and that

the current claims are allowable.


        The examiner notes that the main reason for the current claims overcoming the

previous 101 rejection, 103 rejection, and examiner arguments is the claimed storage of

advertising assembly/presentation commands in an advertising records database and the

claimed steps for computing systems generation of code for placement at webpages in response

to options selected by an advertiser user in a user interface, the code written to cause billboard

module code to be loaded when the particular webpage is loaded in order to retrieve and

present an advertisement on the webpage.  Per the filed specification (Figure 28), this code

generation claim limitation refers to a user interface which receives advertiser input options and

generates a code which can be copied and pasted into the HTML code of a webpage in order to

enable billboard/banner advertisement functionalities on that webpage.  As a result of this claim

limitation generating usable billboard/banner functionality code in response to advertiser

interface input, it claims a solution to a technical problem regarding implementing

billboard/banner functionality on a webpage.  Therefore, this claim limitation overcomes the

previous 101 rejection.  This claim limitation is also not found in the previously cited prior art

and overcomes the previous 103 rejection.  The examiner notes that in regards to independent

claim 1, aside from the code generation limitation, all of the remaining limitations are found in

their entirety in at least two prior art references, individually:

Regarding claim 1, both the Jha publication (U.S. Patent Application Publication No. 2005/0033641) and the Lynn publication (U.S. Patent Application Publication No. 2006/0248110) are prior art references which individually disclose a system comprising:

a database configured to store a plurality of records (Jha: Figure 1; Figure 11; [0047]-[0049]; [0056]; [0066]-[0067]; [0082]; [0144]) (Lynn: Figure 1B; [0015]; [0017]-[0018]; [0041]; [0049]-[0050]) comprising:

one or more commands for retrieving one or more of a plurality of electronic content files designated by one or more advertiser users (Jha: Figure 1; Figure 11; [0048]-[0049]; [0066]-[0067]; [0071]; [0079]; [0145]; [0147]-[0148]) (Lynn: Figure 1B; [0017]-[0018]; [0050]; [0087]);

one or more commands for assembling and presenting the one or more designated electronic content files as an advertisement at one or more of a plurality of webpages (Jha: Figure 1; Figure 11; [0048]-[0049]; [0066]-[0067]; [0073]; [0079]; [0145]) (Lynn: [0018]; [0044]; [0049]-[0050]; [0087]; [0089]); and

one or more parameters for presentation of the advertisement at the one or more webpages (Jha: Figure 18; [0047]; [0067]-[0068]; [0071]-[0072]; [0081]-[0094]; [0151]) (Lynn: Figure 1B; Figure 1C; [0017]-[0018]; [0044]; [0048]-[0049]; [0087]); and

one or more computing systems operable to:

In response to one or more options selected by a particular one of the one or more advertiser users in a user interface, execute code placed at a particular one of the one or more webpages, the first code

written to cause a billboard module to be loaded when the particular

webpage is loaded, the billboard module comprising second code

written to (Jha: Figure 1; Figure 8; [0045]-[0047]; [0063]-[0065]; [0142]-

[0143]; [0147]; [0151]; [0200]) (Lynn: Figure 1B; [0015]; [0035]; [0041];

[0044]-[0045]; [0050]; [0064]; [0089]):

communicate, over one or more computer networks,

with the one or more computing systems (Jha: Figure 1; Figure

8; Figure 19; [0047]; [0063]; [0065]; [0142]-[0143]) (Lynn:

[0044]-[0045]; [0089]); and

retrieve and display one or more advertisements on the

particular webpage (Jha: Figure 1; Figure 8; Figure 12; [0047];

[0049]; [0063]; [0065]; [0073]; [0095]; [0135]) (Lynn: [0044]-

[0045]; [0089]);

select, in response to a communication from the billboard

module over the one or more computer networks, a subset of the

plurality of records, the selection based at least in part on one or more

keywords in the communication from the billboard module (Jha: Figure

18; Figure 19; [0047]-[0048]; [0068]-[0069]; [0098]; [0108]; [0118])

(Lynn: [0003]-[0004]; [0059]; [0087]);

after selecting the subset of the plurality of records based at

least in part on the one or more keywords in the communication from

the billboard module, conduct an auction to select a winning

advertisement from the selected subset of records (Jha: Figure 18;

Application/Control Number: 11/643,245                                                        Page 6
Art Unit: 3622

Figure 19; [0092]; [0119]; [0125]-[0126]) (Lynn: [0002]; [0005]; [0015]-
[0016]; [0035]; [0069]; [0087]); and

provide instructions to the billboard module for the billboard
module to retrieve the winning advertisement and present the winning
advertisement in an area on the particular webpage designated by the
billboard module (Jha: Figure 1; Figure 12; [0049]; [0063]; [0073];
[0135]; [0147]) (Lynn: [0089]).

The only claim limitation that the Jha publication and Lynn publication don't disclose is
the generation, in response to one or more options selected by a particular one of the one or
more advertiser users in a user interface, of first code for placement at a particular one of the
one or more webpages.  However, the examiner further notes that the Worthern publication
(U.S. Patent Application Publication No. 2005/0240596) is a prior art reference which discloses a
system to generate, in response to one or more options selected by a particular one of the one
or more advertiser users in a user interface, first code for placement at a particular one of the
one or more webpages, the first code written to cause a billboard module to be loaded when
the particular webpage is loaded, the billboard module comprising second code written to
communicate with computing systems to retrieve and display advertisements on the particular
webpage (Worthern: Figure 6; [0051]; [0058]).

However, per the reasoning explained in the Patent Board Decision issued on December
18, 2018, the previous 101 rejection, 103 rejection, and examiner arguments have been
withdrawn and the claims are allowable.

Any comments considered necessary by applicant must be submitted no later than the payment
of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such
submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

### *Conclusion*

7.      The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure:

a.      Jha (U.S. Patent Application Publication No. 2005/0033641) discloses a method and

system for providing online target advertising in which a database server manages

banner/billboard advertisements which are served to webpages with corresponding

banner/billboard code modules based on keyword matching and an auction.

b.      Lynn (U.S. Patent Application Publication No. 2006/0248110) discloses a method and

system for providing online target advertising in which a database server manages

banner/billboard advertisements which are served to webpages with corresponding

banner/billboard code modules based on keyword matching and an auction.

c.      Worthern (U.S. Patent Application Publication No. 2005/0240596) discloses a system

and method for generating advertising billboard/banner content display code for placement at

webpages in response to options selected by advertiser users.

d.      Nicholas (U.S. Patent Application Publication No. 2004/0083133) discloses a method and

system for providing network based target advertising in which a database server manages

banner/billboard advertisements which are served to webpages with corresponding banner

code based on keyword matching and an auction.

e.      Morrisroe (U.S. Patent Application Publication No. 2005/0144073) discloses a method

and system for serving billboard/banner advertisements in which script on a webpage contacts

an ad server with code that retrieves advertisements based on parameters.

Application/Control Number: 11/643,245                                                    Page 8
Art Unit: 3622

      f.      Weitzman (U.S. Patent Application Publication No. 2002/0099605) discloses system and method for electronic advertising in which an advertiser creates a banner/billboard advertisement which is presented on a webpage.

      g.      Hagen (U.S. Patent Application Publication No. 2002/0120506) discloses a method and system for electronic advertising utilizing a banner/billboard ad module for creating and presenting banner/billboard advertisements.

8.      Any inquiry concerning this communication or earlier communications from the examiner should be directed to JONATHAN J WHITAKER whose telephone number is (313)446-6555. The examiner can normally be reached on M-F, 9:00 AM to 5:30 PM.

      Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

      If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Peter Choi can be reached on (469) 295-9171. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

      Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

Application/Control Number: 11/643,245                                         Page 9
Art Unit: 3622

/J. J. W./
Examiner, Art Unit 3622
March 20, 2019

/PETER H CHOI/
Supervisory Patent Examiner, Art Unit 3622

# EXHIBIT C

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 570          7590          07/18/2024 | | EXAMINER |
| PANITCH SCHWARZE BELISARIO & NADEL LLP | | BAGGOT, BREFFNI |
| TWO COMMERCE SQUARE | | |
| 2001 MARKET STREET, SUITE 2800 | ART UNIT | PAPER NUMBER |
| PHILADELPHIA, PA 19103 | 3681 | |

DATE MAILED: 07/18/2024

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/135,363 | 04/17/2023 | Brad KRASSNER | 689752-1U7 | 7219 |

TITLE OF INVENTION: SYSTEM AND METHOD FOR CREATION, DISTRIBUTION AND TRACKING OF ADVERTISING VIA ELECTRONIC NETWORKS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $480 | $0.00 | $0.00 | $480 | 10/18/2024 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 40% the amount of undiscounted fees, and micro entity fees are 20% the amount of undiscounted fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 11/23)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via the USPTO patent electronic filing system.

| By mail, send to: | Mail Stop ISSUE FEE<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450 | By fax, send to: | (571)-273-2885 |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications. **Because electronic patent issuance may occur shortly after issue fee payment, any desired continuing application should preferably be filed prior to payment of this issue fee in order not to jeopardize copendency.**

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

570          7590          07/18/2024

PANITCH SCHWARZE BELISARIO & NADEL LLP
TWO COMMERCE SQUARE
2001 MARKET STREET, SUITE 2800
PHILADELPHIA, PA 19103

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via the USPTO patent electronic filing system or by facsimile to (571) 273-2885, on the date below.

| | |
|---|---|
| | (Typed or printed name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/135,363 | 04/17/2023 | Brad KRASSNER | 689752-1U7 | 7219 |

TITLE OF INVENTION: SYSTEM AND METHOD FOR CREATION, DISTRIBUTION AND TRACKING OF ADVERTISING VIA ELECTRONIC NETWORKS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $480 | $0.00 | $0.00 | $480 | 10/18/2024 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BAGGOT, BREFFNI | 3681 | 705-014540 |

| 1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).<br><br>☐ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.<br><br>☐ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.** | 2. For printing on the patent front page, list<br>(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,<br>(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed. | 1 _____<br><br>2 _____<br><br>3 _____ |

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐Issue Fee   ☐Publication Fee (if required)

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via the USPTO patent electronic filing system   ☐ Enclosed check   ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____          Date _____

Typed or printed name _____          Registration No. _____

PTOL-85 Part B (11/23) Approved for use through 03/31/2026          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

|  |  |
|---|---|
|  | UNITED STATES DEPARTMENT OF COMMERCE<br>**United States Patent and Trademark Office**<br>Address: COMMISSIONER FOR PATENTS<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450<br>www.uspto.gov |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/135,363 | 04/17/2023 | Brad KRASSNER | 689752-1U7 | 7219 |

570        7590        07/18/2024

PANITCH SCHWARZE BELISARIO & NADEL LLP
TWO COMMERCE SQUARE
2001 MARKET STREET, SUITE 2800
PHILADELPHIA, PA 19103

| EXAMINER |
|---|
| BAGGOT, BREFFNI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3681 |  |

DATE MAILED: 07/18/2024

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 11/23)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

### Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/ owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013).
https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to:

1) law enforcement, in the event that the system of records indicates a violation or potential violation of law;

2) a federal, state, local, or international agency, in response to its request;

3) a contractor of the USPTO having need for the information in order to perform a contract;

4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record;

5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record;

6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations;

7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals;

8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c));

9) the Office of Personnel Management (OPM) for personnel research purposes; and

10) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

| *Notice of Allowability* | Application No. 18/135,363 | Applicant(s) KRASSNER et al. | |
|---|---|---|---|
| | Examiner BREFFNI X BAGGOT | Art Unit 3681 | AIA (FITF) Status No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to 5/20/24.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 2-8 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☐ All    b) ☐ Some*    c) ☐ None of the:
        1. ☐ Certified copies of the priority documents have been received.
        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.
    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 5/20/24.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

| /BREFFNI BAGGOT/ Primary Examiner, Art Unit 3681 | |
|---|---|

Application/Control Number: 18/135,363                                                          Page 2
Art Unit: 3681

The present application is being examined under the **pre-AIA** first to invent provisions.

DETAILED ACTION

STATUS OF CLAIMS

Claims **1** CANCELED

Claims **2-8** NEW

18135363  filed 04/17/2023  CON of  17961952 , filed 10/07/2022 ,now U.S. Patent # 11741482
17961952  CON of  17316499 , filed 05/10/2021 ,now U.S. Patent # 11468453
17316499  CON of  12384403 , filed 04/04/2009 ,now U.S. Patent # 11004090
12384403  CON of  12316781 , filed 12/16/2008, now abandoned
12384403  CON of  11803779 , filed 05/16/2007 ,now U.S. Patent # 10380602
11803779  CON of  11643245 , filed 12/21/2006 ,now U.S. Patent # 10380597
11643245  Priority from Provisional  60753536 , filed 12/24/2005


1.      This notice of allowability is in reply to the 2/28/21 amendment.

2.      Claims 2-8 are pending and allowable.


Allowable Subject Matter

3.      Claims 2-8 allowed.


Examiner's Reasons for Allowance

Double patenting

Resolved by terminal disclaimer


101

Examiner is removing the rejection under 35 USC 101. The currently amended independent claims include significantly more than any alleged abstract idea. The currently amended independent claims constitute an "ordered combination" that provide a specific, discrete implementation that provides significantly more than the abstract idea itself. To illustrate, the currently amended independent claims recite an ordered combination of features that are comparable to BASCOM Global Internet

Services, Inc. v. AT&T Mobility LLC, 2016 WL 3514158, (Fed. Cir. June 27, 2016). In BASCOM, the

Federal Circuit held that "an inventive concept can be found in the ordered combination of claim

limitations that transform the abstract idea into a particular, practical application of that abstract idea."

Id. In particular, the currently amended independent claims are directed towards a specific, discrete

implementation of browser advertising.


103

The closest prior art is

**Patel** US Pat 7,962,363

**Takakura** US 20030195801 .

In cited art and after further searching, Examiner was not able to find **each and every** limitation of the

amended claims. Examiner tried to find art with a) all the limitations of the claim as it was before the

amendment while showing b) the new limitations of the amendment, c) with references that can be

reasonably combined d) without resort to hindsight bias. Examiner was unsuccessful.

Therefore the 103 rejection is/are withdrawn.


Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to BREFFNI X BAGGOT whose telephone number is (571)272-7154. The

examiner can normally be reached M-F 8a-10a, 12p-6p.

Application/Control Number: 18/135,363                                                           Page 4
Art Unit: 3681

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Hajime Rojas can be reached on 571-270-5491. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and https://www.uspto.gov/patents/docx for information about filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

BREFFNI BAGGOT
Primary Examiner
Art Unit 3681


/BREFFNI BAGGOT/
Primary Examiner, Art Unit 3681

# EXHIBIT D



ADVANCING DIVERSITY    KNOWLEDGE EXCHANGE    THOUGHT LEADERS    MYERS REPORTS    A

 

# Curious Thoughts from Curious Minds: This Could Change Everything - David Cohen - MediaBizBloggers



Author

**David Cohen**

November 10, 2009

UM: Curious Thoughts for Curious Minds

Duration Media v. Rich Media Club
IPR 2023-00953 (Patent 11,443,329)

Rich Media Club Exhibit 2024

Have you ever had a meeting with a potential business partner that rocked your world?

Something that called into question everything that you believed to be true?

I recently had one of those meetings and wanted to share it.

I have spent a good bit of time over the last few years working in an industry capacity, trying to make the "business of doing business" in the digital space more efficient. As Chair of the AAAA Interactive Marketing Committee and co-chair of "Project Reinvention" we have been working to identify the greatest areas of friction in the business and tackling the greatest areas of contention (revising the industry Terms & Conditions as an example).

After 15 years in the digital media business I can safely say that our industry is overly complicated. In order for us to truly scale our business it is critical that *we make it easier* to plan, buy and steward digital campaigns.



Interested in
UM: Curious Thoughts
for Curious Minds

We certainly don't need any more Wall Street Journal articles on "Invisible Ads" or trade publications

**FEATURED VIDEOS**



Unlocking the Power of L
Advertising: Locality's Vis
Broadcast and Streaming
Convergence (Video) - B

More Videos:



RSM's George Casey and G
Art of the Possible to the Ar
Practical (Video)



Clinical Psychologist Turned
Spotlights Societal Injustice
Change

https://www.mediavillage.com/article/curious-thoughts-from-curious-minds-this-could-change-everything-david-cohen...

Duration v. Rich Media Club
IPR2023-00953, 11,443,329
RMC EX2024

Curious Thoughts from Curious Minds: This Could Change Everything - David Cohen - MediaBizBloggers | MediaVillage    10/24/23, 11:41 AM

Case 3:25-cv-02141-DMS-DEB    Document 1    Filed 08/19/25    PageID.87    Page 87 of
138

READ MORE    exposing the dangers of ad networks, click fraud, below the
fold placements, etc. So, you can understand my dilemma
after I met with RealVu last week. Part of me wanted to forget
that the meeting ever happened. The other part of me thought that this little known Salt
Lake City startup could change everything.

It would appear that (among other things) RealVu has developed a technology that allows
them to identify when an online ad is "within the viewable area" of a user's screen, and for
what duration. So, for ads that are run on a particular Web site that require a user to scroll
"below the fold," their ad never gets requested until the user has scrolled to that part of the
page. Makes sense, right? Pretty innocuous you say?

On average, across all placements that they have tracked – fully
50% of online ads are never viewed because they are outside of the
user's viewable area. *Say what?*

Now, keep in mind this is a combination of all properties. Some long tail sites are poorly
constructed and they may indeed have questionable motives, but this does include Top 100
properties as well. The number of ads that we are paying for that go unseen floored me.

In addition to making sure that an advertiser is only charged for an ad that is viewed by a
user, hey are able to see how long the ad is viewed before it leaves the viewable area
(another tab is opened in the browser, user scrolls down the page, etc.).

It is not inconceivable that this kind of data will drive the industry towards an entirely new
buying mechanic. Only paying for the amount of time that an ad is viewed, and obviously not
paying for ads that are not viewed at all. This may very well translate into a decrease in
efficiency (or an increase in CPM), but it will be a far more accurate representation of true ad
delivery. We *are* supposed to be the most measurable and accountable medium, right?

 RealVu has reportedly signed a deal with MSNBC.com to start working with
them to provide their service to advertisers. They also have been working
with some of the leading industry bodies like the IAB and the Media Rating
Council (MRC) to revisit some of the very foundations of our industry, like
what qualifies as an ad impression.

I have no doubt that this will not be the last time we hear about this company nor the last
time we discuss the potential to revise the currency of Internet display advertising. Might this
be the catalyst the industry needs to galvanize around a new standard metric? Engagement,
iGRPs, Brand minutes, involvement score – take your pick. The possibilities are as varied as
they are exciting.

At the end of the day, if this new potential standard makes the business of doing business
easier and more transparent, I believe it will be a giant step forward for the industry. It will
set a new bar for accountability – one that will influence all communications channels,
including the 800 lb. gorilla in your living room.

Remember folks, you heard it here first.

Duration Rich Media Club
IPR2023-00953, 11,443,329
RMC EX2024



Aggressiveness and Caution
Important to Successful Add
GenAI (Video)

Subscribe to MediaV
receive email alerts fe
latest content on ad
media/TV, and marketin
and trends, including
The Myers Report r
findings.

Case 3:25-cv-02141-DMS-DEB    Document 1    Filed 08/19/25    PageID.88    Page 88 of 138

This could change everything.

*David is EVP, US Director of Digital Communications, David's central goal is to spearhead UM's digital and alternative media offering across the US and to accelerate, integrate and intensify a digital best practice throughout the UM universe. David can be reached at david_cohen@universalmccann.com.*

**Read all David's MediaBizBloggers commentaries at Curious Thoughts from Curious Minds - MediaBizBloggers.**

**Follow our Twitter updates @MediaBizBlogger**



### Enjoying This Commentary? There's More to Love

Subscribe to MediaVillage to receive email alerts featuring the latest content on advertising, media/TV, and marketing strategies and trends, including exclusive The Myers Report research findings.

Subscribe



### David Cohen

In his current role as EVP, US Director of Digital Communications, David's central goal is to spearhead UM's digital and alternative media offering across the US and to accelerate, integrate and intensify a digital best practice throughout the UM... read more

https://www.mediavillage.com/article/curious-thoughts-from-curious-minds-this-could-change-everything-david-cohen…iabizbloggers-mediavillage/?tpl=a-single-post    Page 3 of 6

Duration Rich Media Club
IPR2023-00953, 11,443,329
RMC EX2024

# EXHIBIT E

681 F.Supp.3d 1032
United States District Court, D. Arizona.

RICH MEDIA CLUB LLC, Plaintiff,
v.
DURATION MEDIA LLC, Defendant.

No. CV-22-02086-PHX-JJT
|
Signed July 11, 2023
|
Filed July 12, 2023

**Synopsis**
**Background:** Owner of patent related to internet ad viewability and monitoring sued competitor for infringement. Competitor moved to dismiss.

**Holdings:** The District Court, John J. Tuchi, J., held that:

patent was directed to non-abstract concept and was therefore patent-eligible, and

even if patent were directed to patent-ineligible abstract idea, patent contained an inventive concept sufficient to transform the abstract idea into a patent-eligible application.

Motion denied.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

**\*1034** Alison A. Richards, Pro Hac Vice, David P. Berten, Pro Hac Vice, Hannah Sadler, Pro Hac Vice, Global IP Law Group LLC, Chicago, IL, for Plaintiff.

Erin Elizabeth Bradham, Dentons U.S. LLP, Phoenix, AZ, for Defendant.

**ORDER**

John J. Tuchi, United States District Judge

At issue is Defendant Duration Media LLC's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 27, MTD), to which Plaintiff Rich Media Club LLC filed a Response (Doc. 30, Resp.) and Defendant filed a Reply (Doc. 33, Reply). The Court has reviewed the parties' briefs and finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court denies Defendant's Motion to Dismiss.

**\*1035 I. BACKGROUND**
In the Amended Complaint, the operative pleading, Plaintiff states that online advertising is one of the largest advertising markets in the world and faces many challenges that are not common in other media. (Doc. 20, Am. Compl. ¶¶ 7–8.) While advertisements placed in print media or on broadcast television are readily verifiable to advertisers, online advertising presents a different challenge because, for any given content, the size of the user's browser window determines the viewability of the content at any given time. (Am. Compl. ¶¶ 8–9.) Plaintiff develops and sells products and services to provide advertising and marketing solutions to businesses. With regard to online advertising, Plaintiff developed patented technology that ensures that an advertisement appears on the portion of a web browser window being viewed by a potential consumer. (Am. Compl. ¶¶ 10–11.)

This matter arises out of Plaintiff's patent infringement claim against Defendant under 35 U.S.C. § 271. As of October 11, 2022, Plaintiff had "received ten issued United States patents for inventions related to ad viewability, monitoring, and confirmation." (Am. Compl. ¶ 13.) Among those patents is U.S. Patent No. 11,443,329 ("'329 Patent"), titled "System and Method for Creation, Distribution, and Tracking of Advertising Via Electronic Networks," which was issued to Plaintiff by the United States Patent and Trademark Office ("USPTO") on September 13, 2022. (Am. Compl. ¶¶ 14–15.) The '329 Patent relates to a system and method for "determining

whether a predefined area of an ad content display page that is used to display an advertisement is in view within a visible area of a browser window," rendering an advertisement within that predefined area based upon a real-time auction, and rendering a replacement advertisement within the area after a predefined length of time. (*See* Doc. 30-1, Resp. Ex. A, '329 Patent columns 67–69.)

Claims 1, 2, 3, and 5 of the '329 Patent recite:

What is claimed is:

1. A method comprising:

(a) determining whether a predefined area of an ad content display page that is used to display an advertisement is in view within a visible area of a browser window of a browser configured to be operated by a remote computing device, wherein the predefined area is a portion of the ad content display page, and wherein the ad content display page includes (i) the predefined area configured to display advertisement content, the predefined area being a portion of the ad content display page, and (ii) page content displayed in other portions of the ad content display page, the page content being separate from the advertisement content; and

(b) in response to a determination that the predefined area that is used to display the advertisement has been in view within the visible area of the browser window for a predefined period of time, causing a communication to be sent to one or more dispatcher servers, wherein the one or more dispatcher servers are configured to:

(i) receive the communication;

(ii) cause a replacement advertisement to be selected for display on the ad content display page; and

(iii) cause the replacement advertisement to be served to the remote computing device; wherein the **\*1036** browser is further configured to render the replacement advertisement in the predefined area.

2. The method of claim 1 wherein the replacement advertisement is selected at least partially as a result of a replacement auction.

3. The method of claim 2 wherein the replacement auction is conducted in real time between the time the second communication is sent from the remote

computing device and the time that the replacement advertisement is selected.

4. [not at issue] ...

5. The method of claim 1 wherein the predefined area of the ad content display page currently displays an advertisement, and wherein the replacement advertisement replaces the currently displayed advertisement.

('329 Patent columns 68–69.)

Plaintiff alleges that the individual elements in the claim—and the claimed combination—in the '329 Patent were not routine, well-understood, or conventional at the time of the invention. (Am. Compl. ¶ 22.) For its part, Defendant was issued U.S. Patent No. 11,195,210 ("'210 Patent") on December 7, 2021.[1] (Am. Compl. Ex. E, '210 Patent at 2 of 20.) The '210 Patent "relates generally to systems and methods for real-time viewable advertising, and more specifically, to systems and methods that programmatically sell the same ad space on the same computing device multiple times." ('210 Patent column 1.) The '210 Patent includes a diagram nearly identical to Figure 11 contained in the '329 Patent, which Plaintiff alleges was copied by Defendant from one of Plaintiff's patents. (Am. Compl. ¶ 55.)

On December 9, 2022, Plaintiff filed suit against Defendant for one count of patent infringement, claiming that Defendant "directly infringed [at least claims 1, 2, 3, and 5 of] the '329 Patent ... by making, using, offering for sale, and/or selling Infringing Services[.]" (Am. Compl. ¶ 45.) Plaintiff requests that the Court declare that Defendant infringed the '329 Patent under 35 U.S.C. § 271 and enter an injunction preventing Defendant from continuing to infringe the '329 Patent. Additionally, Plaintiff seeks monetary relief, increased damages for willful and deliberate infringement under 35 U.S.C. § 284, and recovery of its attorneys' fees and costs incurred in prosecution under 35 U.S.C. § 285. (Am. Compl. ¶¶ 55, 56 & at 22–23.)

In its reasserted Motion to Dismiss, filed March 22, 2023, Defendant seeks dismissal of the Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). (MTD at 1.) Defendant contends that Plaintiff's '329 Patent is invalid because it is directed to patent-ineligible subject matter under 35 U.S.C. § 101: specifically, an "abstract idea." (MTD at 1.)

## II. LEGAL STANDARD

Rule 12(b)(6) is designed to "test[ ] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal **\*1037** theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (cleaned up and citations omitted). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 679–80, 129 S.Ct. 1937. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.' " *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## III. ANALYSIS

Patent eligibility is a question of law that may also contain underlying questions of fact. *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022). As such, patent eligibility can be determined as a matter of law on a motion to dismiss only when there is no issue of material fact regarding the claim elements or claimed

combination. *Id.* Put another way, determination of patent eligibility at the pleading stage is appropriate "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

Patents granted by the USPTO are presumed to be valid. *See* 35 U.S.C. § 282(a); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011). This presumption reflects the fact that experts in the technical field have "already examined whether the patent satisfies the 'prerequisites for issuance of a patent,' including § 101." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (quoting *Microsoft*, 564 U.S. at 95–96, 131 S.Ct. 2238). However, "[a] party asserting an invalidity defense may overcome this presumption with 'clear and convincing evidence' proving otherwise." *Datanet LLC v. Microsoft Corp.*, 2023 WL 3947829, at \*2 (W.D. Wash. June 12, 2023) (quoting *Microsoft*, 564 U.S. at 97, 131 S.Ct. 2238); *see also Cisco Systems, Inc. v. Uniloc USA, Inc.*, 386 F. Supp. 3d 1185, 1190 (N.D. Cal. 2019).

The Patent Act identifies patent-eligible subject matter where it states that "[w]homever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor ...." 35 U.S.C. § 101. The **\*1038** term "process" means "process, art or method, and *includes a new use of a known* process, machine, manufacture, composition of matter, or material." 35 U.S.C. § 100(b) (emphasis added). The United States Supreme Court has repeatedly affirmed that there are three categories of exceptions to this provision: " 'laws of nature, natural phenomena, and abstract ideas' are not patentable subject matter under § 101 of the Patent Act ...." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012) (quoting *Diamond v. Diehr*, 450 U.S. 175, 185, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981)). However, "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* at 71, 132 S.Ct. 1289. Therefore, in order to avoid a too-broad interpretation of the exclusionary principle that would "eviscerate" patent law, the Supreme Court has stated that an invention may well be patentable if the nature of the claimed process or claimed combination transforms the patent-ineligible concept into a patent-eligible application of that concept. *Id.*

In *Mayo*, the Supreme Court set forth a two-step framework for distinguishing patents that claim one of the judicial exceptions from those that claim "patent-eligible

Rich Media Club LLC v. Duration Media LLC, 681 F.Supp.3d 1032 (2023)

applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014) (citing *Mayo*, 566 U.S. at 72, 132 S.Ct. 1289). The Supreme Court further developed the utility of this framework in *Alice*, where it applied the two-part test to determine whether a patent was directed to an abstract idea. *Id.* at 217, 134 S.Ct. 2347. The first step of the *Alice* test asks whether the patent is directed to an abstract idea. *Id.* If it is not, then the ineligibility inquiry ends. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016). However, if a claim is directed to an abstract idea, then step two of the *Alice* test asks whether the elements of the claim individually and as an ordered combination contain an "inventive concept" sufficient to transform the claimed abstract idea into a patent-eligible application of that idea. *Alice*, 573 U.S. at 217–18, 134 S.Ct. 2347 (citing *Mayo*, 566 U.S. at 71–72, 77–78, 132 S.Ct. 1289) (internal quotations omitted).

### A. Abstractness

Step one of the *Alice* test examines whether the asserted patent is directed to an abstract idea by focusing on the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). Defendant argues that the '329 Patent is directed to patent-ineligible subject matter because Claim 1 "is directed to the abstract idea of organizing human activity, namely, displaying an advertisement when a certain condition is met." (MTD at 5.) However, Defendant mischaracterizes the '329 Patent by describing it as strictly an advertisement placement function and therefore a process that could be performed mentally by a human. (MTD at 9.) The '329 Patent recites a process that is significantly more than performing a conventional economic activity based on meeting a predefined condition, because the claim language describes with sufficient specificity how the steps are performed beyond reciting the generic computer components necessary to implement the functions and is therefore not results-focused. Specifically, for example, Claim 1 recites steps that include "*determining* whether a predefined area of an ad content display page ... is in view within a visible area of a browser window[,]" "*causing* a communication to be sent[;] ... a replacement advertisement to be selected for display ...; **\*1039** and ... the replacement advertisement to be served to the remoted computing device[,]" and "*configur[ing]*" the browser to "*render* the replacement advertisement in the predefined area." ('329 Patent columns 68–69 (emphasis added).) While Defendant asserts that the '329 Patent's claims

recite a process that is as simple as a sign holder waving a sign at passing cars, Plaintiff's claimed system as a whole is an advertisement placement function utilizing electronic networks, contains ad tracking and viewability software and real-time analysis, and necessarily depends on browser window sizing assessment technology.

Further, Plaintiff asserts that the claims at issue are "not directed to [the allegedly abstract idea of] displaying an advertisement when a predefined condition has been met, but rather a specific, improved method for rendering advertisements in web browsers." (Resp. at 10.) "In the context of computer innovations and software, the 'step-one inquiry often turns on whether the claims focus on "specific asserted improvements in computer capabilities," which are patentable ....' " *Datanet*, 2023 WL 3947829, at *3 (quoting *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022)). "Indeed, some improvements in computer-related technology when appropriately claimed are undoubtedly not abstract ...." *Enfish*, 822 F.3d at 1335. In the Amended Complaint, Plaintiff alleges that the claimed inventions in the '329 Patent "make specific improvements to the functionality and usefulness of electronic networks used for advertising[:]"

> The present invention does not embed advertising HTML files within a web page, providing considerable economies to advertisers in saved labor, time and cost in terms of both inserting advertisements into web page files, and later changing any of those advertisements.

(Am. Compl. ¶ 17.)

Plaintiff claims further improvements recited in the '329 Patent, such as, "the present invention functions totally transparently to a network user ... [and] does not require a network user to download or install ... a separate application specifically to receive advertising ...." *Id.* Moreover, Plaintiff cites the approval of a related patent (Am. Compl. Ex. A, *Ex Parte Brad Krassner*) in its appeal to the USPTO's initial § 101 rejection of Claim 1 of the '329 Patent, in which Plaintiff stated: "[Claim 1] of the present application recites an improvement to the technical field of determining when to render an advertisement in a predefined area on a page displaying in a browser window." (Am. Compl. ¶ 36, Ex. C at 6.)

Plaintiff stated that the claimed process was an "improve[ment] upon prior art techniques for determining when to render an advertisement in a predefined area on a page displaying in a browser window ...." (Am. Compl. ¶ 37.) The '329 Patent's text includes several iterations of code sampled from the process during a preferred embodiment, showing with sufficient specificity *how* the recited system and method achieve the improvements identified in the specification. (Am. Compl. ¶ 23; '329 Patent columns 24–35, 42–49, 65–68.) Additionally, Figures 51, 53, and 54-A, B, and C of the '329 Patent—which depict the method for creating a content page rendering area space and implementing a correlator code—show with sufficient specificity the process for achieving the promised result. For all of these reasons, the Court finds that the '329 Patent is not directed to an abstract idea.

In light of the validity presumption for issued patents, *see* 35 U.S.C. § 282(a), the Court also finds persuasive the prosecution **\*1040** history of the '329 Patent's predecessors, as well as the fact that the "claims of the '329 [P]atent underwent a § 101 analysis during prosecution." (Am. Compl. ¶ 35.) In the Notice of Allowance for the '329 Patent from the USPTO, issued in response to the § 101 appeal, the Examiner expressly stated under the heading "Allowable Subject Matter": "Claims 2-11 are allowed."[2] Further, under Examiner's Reasons for Allowance, the Examiner concluded: "The amendment in combination with other limitations form an ordered combination and integrated practical application. 101 withdrawn." (Am. Compl. Ex. D at 2.)

The Court also disagrees with Defendant regarding the applicability of *DDR Holdings, LLC v. Hotels.com, LP.*, 773 F.3d 1245 (Fed. Cir. 2014) to the '329 Patent. Defendant claims that the Patent Trial and Appeal Board's ("PTAB") application of *DDR Holdings* to the '329 Patent's predecessors as a basis for reversing the § 101 rejection of claims in those patents is not applicable in this case. (MTD at 13–14.) While the Court is not bound by the prosecution history of the '329 Patent's predecessors, these related patents recite sufficiently similar claims to Claim 1 of the '329 Patent such that the Court finds persuasive the PTAB's reasoning in *Ex Parte Brad Krassner*. In *DDR Holdings*, the Federal Circuit affirmed the lower court's holding that the asserted claims of the infringed patents-at-issue were not so manifestly abstract as to render them invalid for failing to claim patentable subject matter, because the claims

[did] not merely recite the performance of some business

practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution [was] *necessarily* rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.

*DDR Holdings*, 773 F.3d at 1257 (emphasis added).

Here, the reasoning from *DDR Holdings* applies to the '329 Patent because the claims at issue are necessarily rooted in computer technology in order to overcome a problem unique to computer networks in the context of Internet advertising: "verifying whether an online ad entered a part of a web browser window that was viewable to each of many varied web browser/screen combinations ...." (Am. Compl. ¶ 10.) Accountability for and tracking of consumer viewability of an online advertisement, as promised by Plaintiff's services, depend on a technology to determine the size of a browser window and the available space for an advertisement to be placed within the viewable space. As Plaintiff argues, this is a technological solution for a problem for which there is no direct pre-Internet analog. Defendant claims that the § 101 prosecution history of the '329 Patent's predecessors "actually supports [Defendant]'s assertion that the '329 Patent is directed to an abstract idea[,]" because all of the '329 Patent's "limitations reference generic computer components arranged in conventional fashion ...." (MTD at 13–14.) But Plaintiff contends the claimed solution in the '329 Patent "does not recite only conventional computer technology." (Am. Compl. ¶ 23.) In support, Plaintiff points to the patent specification's disclosure of over ten pages of sample computer code, including at columns 24–35, 42–49, and 65–68. (Am. Compl. ¶ 23.) Plaintiff asserts that the limitations of the claims of the '329 Patent indicate that the recited system and methods "seek[ ] to **\*1041** resolve problems rooted in computer technology and arising in the context of advertising on webpages ..." and thus recite significantly more than the abstract idea of advertisement placement as conventionally implemented on a generic computer. (*Ex Parte Brad Krassner* at 11–12.)

Here, as in *Enfish*, "we are not faced with a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation. Rather, the claims are directed to a specific implementation of a solution to a problem in the software arts." *Enfish*, 822 F.3d at 1339. The '329 Patent

claims recite a method solving a problem unique to Internet advertising: assessing the size of a browser window to determine viewability and thus place an advertisement in the most advantageous place, responding to the "network-centric challenge" of consumers being able to use differently sized devices to access the Internet. (*Ex Parte Brad Krassner* at 11-12.) While "not all claims purporting to address Internet-centric challenges are eligible for patent[,]" and claims that merely recite the abstract idea of Internet advertising along with "routine additional steps" do not overcome the judicial exception, *DDR Holdings*, 773 F.3d at 1259, Plaintiff sufficiently alleges that the '329 Patent claims "specify how interactions with the Internet are manipulated to yield a desired result—a result different from ... the routine and conventional sequence of events ordinarily triggered." (Am. Compl. ¶ 24.)

In sum, the '329 Patent is directed to a non-abstract concept: a technological solution to a technological problem. There is no direct pre-computer analog to the problem of lack of accountability for consumer viewability of Internet advertisements caused by the consumer's ability to access the Internet using variations of computer devices with differently sized browser windows. The code generation claim limitation narrows with sufficient specificity the allegedly abstract concept of advertising in a predefined area upon determination of a predefined condition and does so in response to a problem that is unique to the Internet. Therefore, the claimed process of the '329 Patent is deeply rooted in technology and thus directed to a patent-eligible concept.

### B. Inventiveness

If, contrary to the findings of the Patent and Trademark Examiner and this Court, the '329 Patent were found to be directed to an abstract idea, the inquiry would move to step two of the *Alice* test, which provides for the validity of a patent even when it is found to be directed to an abstract idea. Specifically, step two of the *Alice* test asks whether the patent claims, when examined individually and as an ordered combination, contain an inventive concept such that it transforms the patent-ineligible nature of the claim into a patent-eligible application. *Alice*, 573 U.S. at 217, 134 S.Ct. 2347 (citing *Mayo*, 566 U.S. at 71–72, 77–78, 132 S.Ct. 1289).

As noted above, the '329 Patent aims to solve a problem unique to online advertising that arises from consumers' ability to access the Internet from a variety of technological devices with differently sized browser

windows; at the time of the invention, the problem with Internet advertising was that "certain advertisements were never displayed on the screen to the consumer." (Am. Compl. ¶ 21.) Through the method and process recited in the claims of the '329 Patent, Plaintiff promises a service that can "verify[ ] whether an online ad entered a part of a web browser window that was viewable ..." to the consumer, and for how long the advertisement remained within that viewable area. (Am. Compl. ¶ 10.)

**\*1042** Plaintiff asserts that the '329 Patent discloses a sizing technology that can, among other things:

> (1) assist in loading ads just before a user is expected to scroll to the content;

> (2) confirm that an ad is actually placed with the content regardless of whether it becomes viewable (and for how long);

> (3) confirm that an ad actually became viewable (and for how long); and

> (4) allow for the "first print" of an ad to be replaced with a "second print" of a different ad based on various criteria, such as how long the first print ad had been placed, was viewable, or both.

(Am. Compl. ¶ 11.)

Although Defendant contends that the claims require only conventional computer equipment—"browser," "remote computing device," and "dispatch server"—the '329 Patent outlines with sufficient specificity a new and inventive process using these conventional technological devices to improve upon the functionality of Internet advertising at the time of the invention. (MTD at 10.) Plaintiff alleges that not only do the claims of the '329 Patent address Internet-centric problems, but also that "at the time of the invention, the individual elements in the claim, and the claimed combination, were not well-understood, routine, or conventional activity." (Am. Compl. ¶ 22.) The claimed process departs from a routine and conventional sequence of events after the condition precedent has been met because it utilizes an inventive sizing technology to determine where to place the online advertisement based on the size of a particular consumer's browser window. Considered as a whole, the recited steps do more than "merely organize the abstract idea into a stepwise description of a process used to perform the abstract idea." (*Ex Parte Brad Krassner* at 8.)

The '329 Patent contains an inventive concept: implementing a sizing technology in a process for using generic computer equipment in a novel way. As the

Rich Media Club LLC v. Duration Media LLC, 681 F.Supp.3d 1032 (2023)

Examiner stated regarding the ʼ329 Patent Application,[3] the claims of the ʼ329 Patent "in combination with other limitations form an ordered combination and integrated practical application" and thus overcome any objections to the validity of the ʼ329 Patent under 35 U.S.C. § 101. (Am. Compl. Ex. D at 2.) The claims of the ʼ329 Patent provide with sufficient specificity the process and method for Internet advertisement placement based on utilization of an inventive technology for determining the size of a user's browser window.

**IV. CONCLUSION**

Defendant fails to show that the ʼ329 Patent is invalid for being directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Court finds at this—the motion to dismiss—stage that the claims recited in the ʼ329 Patent, in disclosing a solution to the technological problem of Internet advertisement placement and tracking, are deeply rooted in technology and thus directed to patent-eligible subject matter under *DDR Holdings*. The Court also finds

applicable the same analysis as contained in the PTAB's decision regarding § 101 prosecution of Plaintiff's previously issued, closely related Patent No. 10,380,602, of which the ʼ329 Patent is a continuation-in-part.

Additionally, the Court finds that the ʼ329 Patent contains an inventive concept rooted in technology such that it is directed to significantly more than an abstract idea. Because Defendant has not **\*1043** shown that the ʼ329 Patent is directed to patent-ineligible subject matter under 35 U.S.C. § 101 as a matter of law, Plaintiff survives Defendant's Rule 12(b)(6) challenge.

**IT IS THEREFORE ORDERED** denying Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 27).

**All Citations**

681 F.Supp.3d 1032

---

**Footnotes**

[1]    Plaintiff's ʼ329 Patent is a continuation-in-part of related Patent Application No. 12/384,403, filed on April 4, 2009, now Patent No. 11,004,090, which is a continuation-in-part of Patent Application No. 11/803,779, filed on May 16, 2007, now U.S. Patent No. 10,380,602, which is a continuation-in-part of Patent Application No. 11/643,245, filed on Dec. 21, 2006, now U.S. Patent No. 10,380,597, which claimed the benefit of the earlier filing date of U.S. Patent Application No. 60/753,536, filed on December 24, 2005. (*See* ʼ329 Patent column 1.)

[2]    Claim 2 of Patent Application No. 17/317,627 is now Claim 1 (one of the claims at issue) of the issued ʼ329 Patent.

[3]    Patent Application No. 17/317,627.

---

End of Document                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

Trials@uspto.gov                                                      Paper 8
571-272-7822                                              Date: October 17, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DURATION MEDIA LLC,
Petitioner,

v.

RICH MEDIA CLUB LLC,
Patent Owner.

_____

IPR2024-00937
Patent 11,741,482 B2

_____

Before KARL D. EASTHOM, MICHAEL J. FITZPATRICK, and
NEIL T. POWELL, *Administrative Patent Judges*.

FITZPATRICK, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2024-00937
Patent 11,741,482 B2

## I.    INTRODUCTION

Petitioner, Duration Media LLC, filed a Petition to institute an *inter partes* review of all claims, namely claims 1–14, of U.S. Patent No. 11,741,482 B2 ("the '482 patent," Ex. 1001) pursuant to 35 U.S.C. § 311(a). Paper 2 ("Pet."). Patent Owner, Rich Media Club LLC, filed a Preliminary Response pursuant to 35 U.S.C. § 313. Paper 6 ("Prelim. Resp.").

We have authority to determine whether to institute an *inter partes* review. 35 U.S.C. § 314(b); 37 C.F.R. § 42.4(a). Upon consideration of the Petition and the Preliminary Response, and for the reasons explained below, we determine that the information presented does not show a reasonable likelihood that Petitioner would prevail with respect to any claim. *See* 35 U.S.C. § 314(a). Accordingly, we deny the Petition.

### A.    *Real Parties In Interest*

Each party identifies itself as the sole real party in interest. Pet. 10; Paper 4, 1.[1]

### B.    *Related Matters*

Petitioner and/or Patent Owner identify the following as related matters:

- *Rich Media Club LLC v. Duration Media LLC*, No. 2:23-cv-01967 (D. Ariz.);

---

[1] Patent Owner "established a related company, RealVu, Inc. ('RealVu') [to which it] licensed its patents." Prelim. Resp. 14–15. According to Patent Owner, "RealVu was the industry-facing entity used to sell the viewable ad space to advertisers and publishers." *Id.* at 15.

IPR2024-00937
Patent 11,741,482 B2

- *Rich Media Club LLC v. DMG Media, Ltd. d/b/a Dailymail.com*, No. 2-23-cv-00388 (E.D. Tex.);
- *Rich Media Club LLC v. Duration Media LLC*, No. 2:22-cv-02086 (D. Ariz.);
- *Rich Media Club LLC v. ResearchGate GmbH,* No. 2:23-cv-00362 (E.D. Tex.); and
- *Duration Media LLC v. Rich Media Club LLC*, No. IPR2023-00953 (PTAB).

Pet. 10–11; Paper 4, 1–2. In addition, Patent Owner points out there are U.S. patent applications that are related to the '482 patent, although Patent Owner does not identify whether such applications are pending. Paper 4, 1.

In IPR2023-00953, the Board issued a final written decision determining that Petitioner failed to meet its burden of demonstrating that any of the challenged claims of related U.S. Patent No. 11,443,329 B2 ("the '329 patent") were unpatentable. Ex. 2001.

## C. The '482 Patent

The '482 patent is titled "System And Method For Creation, Distribution And Tracking Of Advertising Via Electronic Networks." Ex. 1001, code (54). The prime exemplary electronic network identified is the Internet. *Id.* at 2:7. The '482 patent explains:

> From the advertiser's perspective, there are two main tasks to accomplish: 1) creation of an effective ad; and 2) effective placement of the ad. From the ad publisher's perspective there are also two main tasks to accomplish: 1) display of the highest revenue-producing ads; and 2) reducing the amount of work necessary to place, maintain, track and process payments for advertising.

*Id.* at 2:11–17.

IPR2024-00937
Patent 11,741,482 B2

The '482 patent discloses "creating electronic advertisements using licensed digital content, and distributing such advertisements for display at desired network locations." Ex. 1001, 2:56–59. "The digital content is delivered to designated advertising locations on the network and becomes part of an advertising display composed at the time requested by the network user/ad viewer." *Id.* at 2:66–3:2. "The [described invention] provides the ability for both publishers and advertisers to optimize the benefits of creating and distributing advertisements electronically, and manage and track every aspect of the advertisement creation and distribution process." *Id.* at 3:17–21.

The '482 patent claims priority from numerous ancestor applications, the first of which was provisional application no. 60/753,536, filed on Dec. 24, 2005. Ex. 1001, codes (60), (63). However, the parties agree that the effective filing date of the claims of the '482 patent is April 4, 2009, the date on which application no. 12/384,403 ("the '403 application") was filed. *See* Pet. 21 ("With respect to the '482 patent, the earliest priority date that can be claimed is April 4, 2009, the filing date of the '403 appl."); Prelim. Resp. 2–3 ("The '482 Patent issued from a continuation-in-part application that added new matter with a filing date of April 4, 2009.").

## D. The Challenged Claims

Review is sought for all of the claims of the '482 patent, namely claims 1–14. Claims 1 and 8 are independent, with claim 1 being a method

IPR2024-00937
Patent 11,741,482 B2

claim and claim 8 being a system claim.  Claim 1 is illustrative and

reproduced below:

> 1.    A method for rendering advertisement content in
> an ad content display page, wherein the ad content display page
> includes (i) a predefined area configured to display
> advertisement content, the predefined area being a portion of
> the ad content display page, and (ii) page content displayed in
> other portions of the ad content display page, the page content
> being separate from the advertisement content, the ad content
> display page being scrollable to allow a portion of the ad
> content display page to appear in a visible area of a browser
> window of a browser that is configured to be operated by a
> remote computing device, the method comprising:

> (a) determining whether a predefined portion of the
> predefined area of the ad content display page is in the visible
> area of the browser window; and

> (b) in response to a determination that the predefined
> portion of the predefined area of the ad content display page is
> in the visible area of the browser window, causing a
> communication to be sent from the remote computing device to
> one or more dispatcher servers, wherein the one or more
> dispatcher servers are configured to:

> (i) receive the communication, and

> (ii) cause advertisement content to be served to the
> remote computing device,

> wherein the browser is configured to render the
> advertisement content in the predefined area of the ad
> content display page, and

> wherein the advertisement content first appears in
> the predefined area of the ad content display page only
> after the one or more dispatcher servers serve the
> advertisement content to the remote computing device
> and the browser renders the advertisement content in the
> predefined area of the ad content display page.

Ex. 1001, 59:56–60:24.

IPR2024-00937
Patent 11,741,482 B2

C.    *The Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 1–14 | 103(a) | Koeppel,[3] Seo,[4] Krassner[5] |
| 6, 13 | 103(a) | Koeppel, Seo, Badros,[6] Krassner |

Pet. 25–26.

## II. ANALYSIS

### A. *Claim Construction*

The challenged claims should be read in light of the specification, as it would be interpreted by one of ordinary skill in the art. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Thus, we generally give claim terms their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted); *see also*

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, which was enacted September 16, 2011, made amendments to 35 U.S.C. §§ 102 and 103. AIA § 3(b)–(c). Those amendments became effective eighteen months later on March 16, 2013. *Id*. at § 3(n). Because the application from which the '482 patent issued claims priority to an application filed before March 16, 2013, any citations herein to 35 U.S.C. §§ 102 and 103 are to their pre-AIA versions. *Id*. at § 3(n)(1).
[3] US 2005/0177401 A1, published Aug. 11, 2005 ("Koeppel," Ex. 1006).
[4] WO 2007/089082 A1, published Aug. 9, 2007 ("Seo," Ex. 1018).
[5] US 2007/0265923 A1, published Nov. 15, 2007 ("Krassner," Ex. 1003).
[6] WO 2006/138400 A1, published Dec. 28, 2006 ("Badros," Ex. 1005).

IPR2024-00937
Patent 11,741,482 B2

37 C.F.R. § 42.100(b) (stating that claims are construed in IPRs according to the same standard as used in federal court).

Neither party proffers an express construction of any claim term. *See* Pet. 15; *see generally* Prelim. Resp.

Petitioner does argue, however, that certain claim language appearing in claim 1 is not limiting. Pet. 29–30. That claim language, which we refer shorthand to as the "in response to" limitation, recites the following:

> (b) *in response to* a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window, causing a communication to be sent from the remote computing device to one or more dispatcher servers, wherein the one or more dispatcher servers are configured to:
>
>> (i) receive the communication, and
>>
>> (ii) cause advertisement content to be served to the remote computing device

Ex. 1001, 60:4–14 (emphasis added). Petitioner argues that "this '*in response to*' limitation is non-limiting because it requires a condition precedent that need not ever occur." Pet. 29–30 (citing MPEP § 2111.04 (II); *Ex parte Schulhauser*, Appeal 2013-007847, 2016 WL 6277792 (Apr. 28, 2016) (precedential); *Ex Parte Botman*, Appeal 2021-004052, 2022 WL 4093710 (Sept. 2, 2022); *Ex Parte Gopalan*, Appeal 2017-007009, 2018 WL 2386111 (May 21, 2018); *Ex Parte Erhart*, Appeal 2019-004505, 2021 WL 195811 (Jan. 8, 2021)).

Petitioner, however, does not identify a purported condition precedent that need not ever occur. Pet. 29. Presumably, the only possible candidate would be the language that follows "in response to," i.e., "a determination that the predefined portion of the predefined area of the ad content display

7

IPR2024-00937
Patent 11,741,482 B2

page is in the visible area of the browser window." Ex. 1001, 60:4–6. But nothing in the claim suggests that the determination is optional or that it need not ever occur. For example, the "in response to" limitation of claim 1 does not use the conjunction "if," as was the case in *Schulhauser*. *See* 2016 WL 6277792, *3 (interpreting "triggering an alarm state if the electrocardiac signal data is not within the threshold electrocardiac criteria" such that "triggering an alarm state" only needs to be performed "if the electrocardiac signal data is not within the threshold electrocardiac criteria.").[7] In fact, the prior step (a) of claim 1 explicitly requires the determination, reciting: "(a) determining whether a predefined portion of the predefined area of the ad content display page is in the visible area of the browser window." Ex. 1001, 60:1–3.

As properly construed, the "in response to" language modifies the recited step of "causing a communication to be sent from the remote computing device to one or more dispatcher servers" such that the step must be "in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window." Ex. 1001, 60:4–8. In other words, "causing a communication" is a required step of the method of claim 1.

---

[7] Although the Petition cites several additional cases and a provision of the Manual of Patent Examining Procedure as supporting its proposed construction (*see* Pet. 29–30), the Petition does not explain how those citations allegedly support reading the "in response to" language out of claim 1. We determine they do not.

IPR2024-00937
Patent 11,741,482 B2

### B.    *Obviousness Generally*

A claim is unpatentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).  "Obviousness is a question of law based on underlying facts."  *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1167 (Fed. Cir. 2015).  The underlying facts include (i) the scope and content of the prior art, (ii) the differences between the prior art and the claimed invention, (iii) the level of ordinary skill in the field of the invention, and (iv) any relevant objective considerations of nonobviousness.  *Id.* (citing *Graham v. John Deere of Kan. City*, 383 U.S. 1, 17–18 (1966)).  An additional underlying fact is whether there was a reason to combine prior art teachings when so asserted.  *Id.*

### C.    *Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention.  *Graham*, 383 U.S. at 17.  "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry."  *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).  The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed.  *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

IPR2024-00937
Patent 11,741,482 B2

> Factors that may be considered in determining level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field.

*Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (citation omitted).

Petitioner argues a person having ordinary skill in the art "would have had a bachelor's degree in computer science, computer engineering or electrical (or similar) engineering with about three years of experience in computer science, computer engineering and/or electrical engineering." Pet. 14.

Patent Owner argues that a person having ordinary skill in the art also would have had "experience in the internet advertising industry" and urges us to adopt the same formulation as we adopted in the final written decision in IPR2023-00953. Prelim. Resp. 4. We agree with Patent Owner that the person of ordinary skill in the art would have had such experience. Indeed, it is unclear how Petitioner's proposal accounts for the types of problems encountered in the art or prior art solutions to those problems. *See Daiichi Sankyo*, 501 F.3d at 1256 (identifying these factors, among others, as "a guide to determining the level of ordinary skill in the art").

The difference between the parties' proposals as to the person of ordinary skill in the art, however, is immaterial here. Thus, for purposes of deciding the Petition, we adopt Petitioner's proposal.

IPR2024-00937
Patent 11,741,482 B2

### D.    *The Prior Art*

#### 1.  *Koeppel*

Koeppel is titled "System and Method for Performing Web Based In-View Monitoring."  Ex. 1006, code (54).  String citing one hundred and one consecutive paragraphs of Koeppel, Petitioner argues that it "teaches a client-side script to determine the coordinates of various components of a webpage on a display and whether they are in view."  Pet. 17 (citing Ex. 1006 ¶¶85–185; Ex. 1011 ¶41).[8]  Paragraph 18 of Koeppel (cited at Pet. 17) states:

> [A]lthough conventional on-line target advertising and content provision techniques allow adjustments to be made on downloaded documents in order to target selected users, they lack the ability to monitor and collect detailed user response data associated with content that is actually visible to the users when browsing the downloaded documents. Furthermore, although conventional on-line advertising techniques enable providers to advertise their products and services on third party Web sites, they lack the ability to efficiently perform detailed billing based on whether an advertisement was actually in-view when a Web site including the advertisement is rendered.

Ex. 1006 ¶18.  Petitioner argues that "Koeppel uses information about whether an advertisement is 'in-view or partially in-view' to generate billing records."  Pet. 19 (quoting Ex. 1006 ¶177).

#### 2.  *Seo*

Seo is titled "Method for Offering Advertisement in Association with Contents in View and System for Executing the Method."  Ex. 1018, code

---

[8] Exhibit 1011 is a declaration by Trevor Smedley, Ph.D.

IPR2024-00937
Patent 11,741,482 B2

(54).  Petitioner argues that it "discloses identifying a user event, such as
scrolling, corresponding to a content area becoming visible, and
downloading an advertisement in response to the event." Pet. 19 (citing
Ex. 1018, 5:1–14; Ex. 1011 ¶¶42–43).  Petitioner further argues that "Seo
determines whether a user is 'currently viewing' by detecting whether an
event, such as scrolling, occurs (S202), and displays an advertisement only
when the content area is visible." *Id.* at 20 (citing Ex. 1018, 10:16–18,
Fig. 2).  The excerpt of Seo cited by Petitioner states:  "Also, according to
the present invention, it is possible to provide advertising associated with a
content that a user is currently viewing, and thereby fit an advertiser's
intention to provide advertising associated with the content that the user is
interested in." Ex. 1018, 10:16–18.  Thus, although the cited excerpt of Seo
includes the words "currently viewing" as quoted by Petitioner, it does not
disclose "determining whether a predefined portion of the predefined area of
the ad content display page is in the visible area of the browser window," as
recited in claim 1.  As Patent Owner puts it, "Seo teaches . . . to take an
action 'in response to' a user-initiated event [such as scrolling], not a
determination that a 'predefined portion of the predefined area of the ad
content display page is in the visible area of the browser window.'"  Prelim.
Resp. 8 (quoting claim 1).

### 3. *Badros and Krassner*

Neither Badros nor Krassner is relevant to our decision to deny the
Petition.  Thus, they are not discussed further.

12

IPR2024-00937
Patent 11,741,482 B2

### E.    Ground 1 (Koeppel, Seo, Krassner)

The Petition asserts that claims 1–14 would have been obvious over Koeppel, Seo, and "[o]ptionally Krassner." Pet. 26–38.

### 1.    Claim 1

Petitioner does not have a reasonable likelihood of prevailing with respect to claim 1, because, as explained below, the Petition fails to show how the prior art teaches, or renders obvious, the "in response to" limitation, which we reproduce again as follows:

> (b) in response to *a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window*, causing a communication to be sent from the remote computing device to one or more dispatcher servers, wherein the one or more dispatcher servers are configured to:
>
>> (i) receive the communication, and
>>
>> (ii) cause advertisement content to be served to the remote computing device.

Ex. 1001, 60:4–14 (emphasis added). For brevity, we refer shorthand to the *italicized claim language* above as the "determination" limitation and the underlined claim language above as the "causing a communication" limitation. Thus, the "in response to" limitation includes both the "determination" limitation and the "causing a communication" limitation.

Initially, the Petition relies on Koeppel as disclosing the "determination" limitation of claim 1. *See, e.g.,* Pet. 30 ("Koeppel . . . teaches 'determining the proportion of a component in view.'" (quoting Ex. 1006 ¶ 125)); *see also id.* at 17–19 (discussing Figure 9B of Koeppel). The Petition asserts that Koeppel further teaches "performing an action" in

IPR2024-00937
Patent 11,741,482 B2

response to the determination. *Id.* at 30 (citing Ex. 1006 ¶ 177). A responsive action is possible in Koeppel, the Petition explains, because "the client notifies the server when 'user events' occur, including 'whether content is actually in-view.'" *Id.* at 30 (quoting Ex. 1006 ¶ 82). The responsive action in Koeppel, however, does not satisfy the "causing a communication" limitation of claim 1. Nor does the Petition argue that it does, and, in fact, the Petition concedes that it does not. *Id.* at 31.

Accordingly, the Petition turns to Seo. Pet. 31–32. In turning to Seo, the Petition asserts that (1) Seo, like Koeppel, teaches the "determination" limitation and (2) Seo additionally teaches the "causing a communication" limitation. In particular, the Petition asserts:

> Koeppel, however, does not disclose "*in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window ... cause advertisement content to be served to the remote computing device*." Seo discloses this limitation.

Pet. 31 (Petitioner's ellipsis). Relatedly, the Petition also asserts:

> Seo teaches waiting [sic] "*the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window*" until it causes "*a communication to be sent from the remote computing device to one or more dispatcher servers*."

Pet. 32 (quoting claim 1).

Despite asserting that Seo teaches the "determination" limitation, the Petition does not show where Seo does so or explain how its teachings might be interpreted to do so. The closest thing the Petition points to is the detection in Seo's system of the act of scrolling. *See* Pet. 20 ("Seo determines whether a user is 'currently viewing' by detecting whether an event, such as scrolling, occurs (S202), and displays an advertisement only

14

IPR2024-00937
Patent 11,741,482 B2

when the content area is visible." (citing Ex. 1018, 10:16–18)); *see also* Ex. 1018, 5:11–14 ("In operation S202, the system identifies whether the event occurs. When the event occurs, the system performs operation S203, otherwise, the system waits for the event to occur. In this instance, the event may include a user enter event or a scrolling event."). Whether a scrolling event occurs, however, does not satisfy the specific language of the claim reciting "a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window." Nor does the Petition explain how it might.

As for the "causing a communication" limitation, the Petition does not explain how Seo teaches all of its components. Instead, the Petition implies, by virtue of an ellipsis, that the "causing a communication" limitation merely requires "advertisement content to be served to the remote computing device" and nothing further. In Petitioner's words:

> Koeppel, however, does not disclose "*in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window ... cause advertisement content to be served to the remote computing device.*" Seo discloses this limitation.

Pet. 31 (Petitioner's ellipsis). Where Petitioner uses an ellipsis, claim 1 recites: "causing a communication to be sent from the remote computing device to one or more dispatcher servers, wherein the one or more dispatcher servers are configured to: (i) receive the communication." The Petition does not show where in the prior art these features allegedly are taught or that they would have been obvious.

We are cognizant of the Petition's statement that, in view of Koeppel, it was a "well-known fact that advertisements are delivered to browsers

IPR2024-00937
Patent 11,741,482 B2

because a server '*receive[d] a communication*' from the browser." Pet. 32–33 (citing Ex. 1006 ¶172; Ex. 1011 ¶¶51–56). The Petition, however, does not explain what, if anything, the person of ordinary skill in the art would have done in view of the "well-known fact." Further, to the extent that the Petition asserts that such a communication is inherent, the Petition fails to explain why that would be so. *See Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1384 (Fed. Cir. 1999) ("Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient to establish inherency.").

Even assuming Koeppel teaches the "determination" limitation and Seo teaches the "causing a communication" limitation, the Petition does not explain how the prior art teaches, or renders obvious, the latter "in response to" the former, as recited in claim 1. As Patent Owner explains it:

> Given that Seo does not teach that it makes a "determination that the predefined portion of the predefined area of the ad content display page is in the visible are of the browser window," *by definition it cannot teach to take an action "in response" to a determination Seo never makes*.

Prelim. Resp. 10 (emphasis added). We agree with Patent Owner.

The Petition does not demonstrate how the combination of Koeppel and Seo would result in the "in response to" limitation. The Petition argues that *some combination* of Koeppel and Seo would have been obvious, stating:

> Koeppel and Seo are both directed to a system of determining whether an online advertisement is in view. Ex-1006, abstract; Ex-1018, abstract; Ex-1011, ¶51. Seo further teaches that it would be beneficial to only download advertisements "associated with a content that the user is currently viewing." Ex- 1018, 2:9-11. The combination of

16

IPR2024-00937
Patent 11,741,482 B2

> known elements of Koeppel and Seo would achieve the
> predictable result of downloading an advertisement in response
> to a predefined area, or portion thereof, appearing in the visible
> area of a display. This would be an obvious solution to try given
> the fact that both Koeppel and Seo teach downloading
> advertisements. Ex-1006, abstract; Ex-1018, 5:1-14, 10:16-18.

Pet. 26. But, the Petition does not articulate any combination of Koeppel
and Seo that includes the "in response to" limitation, wherein the "causing a
communication" limitation occurs *in response to* the "determination"
limitation.

In sum, the Petition fails to demonstrate that the asserted prior art
teaches, or renders obvious, the "causing a communication" limitation, let
alone it being in response to the "determination" limitation. There is not a
reasonable likelihood of Petitioner prevailing as to claim 1.

## 2. Claims 2–14

Independent claim 8 is a system claim that includes a limitation
materially similar to that discussed above. Ex. 1001, 61:1–9. The Petition
groups independent claims 1 and 8 together and relies on its claim 1 analysis
for claim 8. Pet. 27–34. Thus, there is not a reasonable likelihood of
Petitioner prevailing as to claim 8. Further, it necessarily follows that there
is not a reasonable likelihood of Petitioner prevailing on this ground as to
any of the dependent claims. *See In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir.
1988) ("Dependent claims are nonobvious under section 103 if the
independent claims from which they depend are nonobvious.").

IPR2024-00937
Patent 11,741,482 B2

### F.    Ground 2 (Koeppel, Seo, Badros, Krassner)

The Petition asserts that dependent claims 6 and 13 would have been obvious over Koeppel, Seo, "[o]ptionally Krassner," and Badros.  Pet. 38–40.  The Petitioner does not apply the additional reference, Badros, in a manner that cures the deficiencies in the Ground 1 challenge to claims 1–14. Accordingly, there is not a reasonable likelihood of Petitioner prevailing on this ground as to either of claims 6 and 13.

## III. CONCLUSION

The Petition fails to show there is a reasonable likelihood that Petitioner would prevail with respect to at least one of the claims challenged in the Petition.  *See* 35 U.S.C. § 314(a); 37 C.F.R. § 42.108.  Accordingly, we deny the Petition.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Petition is denied, and no trial is instituted.

IPR2024-00937
Patent 11,741,482 B2


PETITIONER:

Kevin Greenleaf
Joel Bock
DENTONS US LLP
kevin.greenleaf@dentons.com
joel.bock@dentons.com

PATENT OWNER:

Ragnar Olson
GLOBAL IP LAW GROUP, LLC
rolson@giplg.com

# EXHIBIT G

Anthropic Claude Sonnet 4.0 Model Response on August 4, 2025 to the prompt:

Yes, I am referring to "ad refresh/rotation" where RTB ads replace existing ads in the same placement after a certain time period. Is there a rough estimate of the revenue in the united States of ads that are replaced this way?

Based on my research, I can provide you with a comprehensive estimate of ad refresh/rotation revenue in the United States:

## Total US Programmatic Market Context

US programmatic digital display ad spend reached approximately $157-168 billion in 2024, representing about 91% of all digital display advertising (sources: https://www.statista.com/statistics/278727/programmatic-display-ad-spend-in-the-us/, https://www.emarketer.com/learningcenter/guides/programmatic-digital-display-ad-spending/). This massive market provides the foundation for understanding ad refresh revenue.

## Ad Refresh Revenue Share

While there isn't a single definitive figure for the exact percentage of programmatic revenue attributable to ad refresh, industry sources provide strong indicators:

**Revenue Impact Range:** Publishers implementing ad refresh strategies typically see revenue uplifts ranging from 5-10% on the conservative end to 30-40% for well-optimized implementations (sources: https://blog.relevant-digital.com/how-to-do-ad-refresh-properly, https://www.pubstack.io/white-papers/ad-refresh-strategy-best-practices). Some publishers have achieved up to 35% revenue growth through strategic ad refresh on sites with engaged users who stay longer (https://blog.relevant-digital.com/how-to-do-ad-refresh-properly).

**Conservative Estimate:** If we assume that ad refresh contributes to approximately **15-25%** of total programmatic revenue (a reasonable middle ground based on the uplift data), this would translate to:

- **$24-42 billion annually** in the US from ad refresh/rotation
- This represents ads that are served as replacements in existing placements after initial page load

# Key Factors Affecting Ad Refresh Revenue

Ad refresh works by serving multiple impressions in the same ad slot during a single user session, increasing total impressions while potentially reducing individual CPMs (https://www.adpushup.com/blog/ultimate-guide-to-ad-refresh/). The strategy focuses on maximizing revenue per session (RPS) and earnings per thousand visits (EPMV) rather than individual CPM rates (sources: https://headerbidding.co/ad-refresh/, https://www.adpushup.com/blog/ultimate-guide-to-ad-refresh/).

**Growth Drivers:**

- Integration with RTB platforms ensures advertisers can bid on refreshed inventory in real-time (https://www.andbeyond.media/blogs/ad-refresh-how-it-works/)
- Modern "smart" ad refresh only triggers when ads are 75-100% viewable (https://headerbidding.co/in-view-ad-refresh/)
- Advanced implementations track user engagement to optimize refresh timing (https://www.mile.tech/blog/ad-refresh-what-goes-wrong-and-how-to-do-it-right)

# Bottom Line

**Rough US ad refresh revenue estimate: $25-40 billion annually** - representing a significant portion of the $157+ billion programmatic market. This reflects the industry's shift toward maximizing inventory efficiency through time-based monetization rather than just page-view-based models.

The actual number likely falls in this range, with higher-end publishers and sites with longer user engagement seeing disproportionately higher ad refresh revenue contributions.

# EXHIBIT H

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

### U.S. Patent No. 11,468,453: MediaNews Group's denverpost.com

| Claim 5 | Analysis | Select Evidence |
|---|---|---|
| A method comprising: | MediaNews Group ("MNG") performs the following claimed method via its website, denverpost.com. |  Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 5 | Analysis | Select Evidence |
|---|---|---|
| (a) in response to a determination that a predefined area of an ad content display page is within a predefined distance outside of a visible area of a browser window of a browser configured to be operated by a remote computing device, causing a first communication to be sent to one or more dispatcher servers, | MNG's website comprises ad content display pages.<br><br>In response to a determination that a predefined ad space (e.g., "U4") is within a predefined distance outside of a visible area of a browser window, MNG causes a first communication (e.g., an ad request) to be sent to one or more dispatcher servers.<br><br>The black box on the right indicates the visible area of the website as a user scrolls. When ad space "U4" is within a predefined distance from the visible area of the website, MNG requests and renders an advertisement in that spot. | <br>Source: https://www.denverpost.com/<br><br><br>Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 5 | Analysis | Select Evidence |
|---|---|---|
|  | In one example shown on the right, the first advertisement in U9 is not requested and rendered until 02:47.743 after the website loads, when U9 is within a predefined distance from the visible area of the website. |  |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 5 | Analysis | Select Evidence |
|---|---|---|
| | MNG's website is viewable on browsers configured to be operated by remote computing devices (e.g., laptops, smartphones, and tablets). |  Source: https://www.denverpost.com/    Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 5 | Analysis | Select Evidence |
|---|---|---|
| wherein the ad content display page includes (i) the predefined area configured to display advertisement content, the predefined area being a portion of the ad content display page, and (ii) page content displayed in other portions of the ad content display page, the page content being separate from the advertisement content, and | MNG's website includes the predefined ad space (e.g., "U4") and separate page content (e.g., news articles and images) displayed in other portions of the website. | 

Source: https://www.denverpost.com/ |
| wherein the one or more dispatcher servers are configured to cause a first advertisement to be served to the remote computing device upon receipt of the first communication, | The dispatcher servers are configured to cause a first advertisement to be served to the remote computing device upon receipt of the first communication (e.g., an ad request). | |
| wherein the browser is configured to render the first advertisement in the predefined area; | The browser is configured to render the first advertisement in the predefined ad space.

As shown on the right, the first advertisement rendered in U4 is a Planned Parenthood ad, as indicated by n=1. | |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 5 | Analysis | Select Evidence |
|---------|----------|-----------------|
| (b) determining whether the predefined area is in view within the viewable area of the browser window on the remote computing device; | MNG determines whether the predefined ad space is in view within the viewable area of the browser window on the remote computing device.<br><br>As shown on the right, the U4 ad space is in view when it is inside the black border. | <br>Source: https://www.denverpost.com/<br><br>Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 5 | Analysis | Select Evidence |
|---|---|---|
| (c) in response to a determination that the predefined area has been in view within the viewable area of the browser window for a predefined period of time, causing a second communication to be sent to the one or more dispatcher servers, | In response to a determination that the predefined ad space has been in view for a predefined period of time (e.g., 30 seconds), MNG causes a second communication (e.g., a second ad request) to be sent to the dispatcher servers. |  |
| wherein the one or more dispatcher servers are further configured to: | The dispatcher servers are further configured to receive the second communication, cause a replacement advertisement to be selected for display, and cause the replacement advertisement to be served to the remote computing device. | |
| (i) receive the second communication; | | |
| (ii) cause a replacement advertisement to be selected for display on the ad content display page; and | | |
| (iii) cause the replacement advertisement to be served to the remote computing device; | | |
| wherein the browser is further configured to render the replacement advertisement in the predefined area. | The browser is further configured to render the replacement advertisement in the predefined ad space.

In the example on the right, the replacement ad is indicated by n=2. | |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 5 | Analysis | Select Evidence |
|---|---|---|
| | In another example shown on the right, MNG replaces the ad in the U4 ad space approximately every 30 seconds when the ad space is in view. |   Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 6 | Analysis | Select Evidence |
|---|---|---|
| The method of claim 5 wherein the replacement advertisement is selected at least partially as a result of a replacement auction. | MNG selects replacement advertisements at least partially as a result of a replacement auction. | <br>Source: https://www.denverpost.com/ |

| Claim 7 | Analysis | Select Evidence |
|---|---|---|
| The method of claim 6 wherein the replacement auction is conducted in real time between the time the second communication is sent and the time that the replacement advertisement is selected. | MNG conducts replacement auctions in real time between the time the second communication is sent and the time that the replacement advertisement is selected. | <br>Source: https://www.denverpost.com/ |

# EXHIBIT I

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

## U.S. Patent No. 11,741,482: MediaNews Group's denverpost.com

| Claim 1 | Analysis | Select Evidence |
|---|---|---|
| A method for rendering advertisement content in an ad content display page, | MediaNews Group ("MNG") performs the following claimed method for rendering advertisement content in an ad content display page via its website, denverpost.com. | Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 1 | Analysis | Select Evidence |
|---|---|---|
| wherein the ad content display page includes | MNG's website comprises ad content display pages. |  |
| (i) a predefined area configured to display advertisement content, the predefined area being a portion of the ad content display page, and | MNG's website includes a predefined ad space (e.g., "U4") and separate page content (e.g., news articles and images) displayed in other portions of the website. | |
| (ii) page content displayed in other portions of the ad content display page, the page content being separate from the advertisement content, | | |
| the ad content display page being scrollable to allow a portion of the ad content display page to appear in a visible area of a browser window of a browser that is configured to be operated by a remote computing device, the method comprising: | MNG's website is scrollable to allow a portion of it to appear in a visible area of a browser window.

In the evidence on the right, the black box indicates the visible portion of the website as a user scrolls. | Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 1 | Analysis | Select Evidence |
|---|---|---|
|  | MNG's website is viewable on browsers configured to be operated by remote computing devices (e.g., laptops, smartphones, and tablets). |  Source: https://www.denverpost.com/    Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 1 | Analysis | Select Evidence |
|---|---|---|
| (a) determining whether a predefined portion of the predefined area of the ad content display page is in the visible area of the browser window; and<br><br>(b) in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window, causing a communication to be sent from the remote computing device to one or more dispatcher servers, | MNG determines whether a predefined portion (e.g., at least 50%) of the predefined ad space is visible.<br><br>In response to this determination, MNG causes a communication (e.g., an ad request) to be sent from the remote computing device to one or more dispatcher servers.<br><br>In the example on the right, MNG does not request a replacement ad for U4 until over 50% of the current ad has been visible to a user.<br><br>In the top image, only 47% of the Vrbo ad (n=1) is visible (A=47). In the middle image, 100% of the Vrbo ad is visible (A=100). In the bottom image, MNG has requested and rendered a new ad in U4 (the Twilio ad, n=2) because the Vrbo ad was in the visible area of the browser window. | Source: https://www.denverpost.com/<br><br>Source: https://www.denverpost.com/<br><br>Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 1 | Analysis | Select Evidence |
|---|---|---|
| wherein the one or more dispatcher servers are configured to: (i) receive the communication, and (ii) cause advertisement content to be served to the remote computing device, | The dispatcher servers are configured to receive the ad request and cause advertisement content to be served to the remote computing device. |  Source: https://www.denverpost.com/ |
| wherein the browser is configured to render the advertisement content in the predefined area of the ad content display page, and | The browser is configured to render the advertisement content in the predefined ad space ("U4"). | |
| wherein the advertisement content first appears in the predefined area of the ad content display page only after the one or more dispatcher servers serve the advertisement content to the remote computing device and the browser renders the advertisement content in the predefined area of the ad content display page. | The advertisement content first appears in the predefined ad space only after the dispatcher servers serve the advertisement content to the remote computing device and the browser renders the advertisement content in the predefined ad space of the website. | |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 2 | Analysis | Select Evidence |
|---|---|---|
| The method of claim 1 wherein after the one or more dispatcher servers receive the communication, the one or more dispatcher servers further:<br><br>(iii) cause advertisement content to be selected for display on the ad content display page, wherein the selected advertisement content is then served to the remote computing device. | After MNG's dispatcher servers receive the communication, the server(s) cause advertisement content to be selected for display on the ad content display page.<br><br>The selected advertisement content is then served to the remote computing device. | <br>Source: https://www.denverpost.com/ |

| Claim 3 | Analysis | Select Evidence |
|---|---|---|
| The method of claim 2 wherein the advertisement content is selected at least partially as a result of an auction. | MNG selects advertisements at least partially as a result of an auction. | <br>Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 4 | Analysis | Select Evidence |
|---|---|---|
| The method of claim 3 wherein the auction is conducted in real time between the time the communication is sent from the remote computing device and the time that the advertisement content is selected. | MNG's auction is conducted in real time between the time the communication is sent from the remote computing device and the time that the advertisement content is selected. |  Source: https://www.denverpost.com/ |

Non-limiting example of infringement based on information presently available (draft/subject to revision)
Claim preamble may not serve as a limitation.

| Claim 6 | Analysis | Select Evidence |
|---|---|---|
| The method of claim 1 further comprising:<br><br>(c) maintaining the same advertisement content that was previously rendered in the predefined area for at least a predefined period of time during the time period that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window. | MNG maintains the same advertisement content in the predefined ad space for at least a predefined period of time (e.g., 30 seconds) during the time period that the predefined portion (e.g., at least 50%) of the ad space is in the visible area of the browser window. | <br>Source: https://www.denverpost.com/ |